**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

MARIO A. SABATES,           )
                                  )
     Plaintiff,           )
                                  )    CIVIL ACTION NO.:_____
     v.                   )
                                  )
HOWARD R. CURD, HOWARD F.    )
CURD, EILEEN S. CURD,         )
JESUP & LAMONT SECURITIES    )
CORPORATION, and KC          )
MAY SECURITIES CORPORATION,  )
                                  )
     Defendants.        )

8. 04cv 824-T26
MSS

_____)

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Mario A. Sabates alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for violations of federal and state securities laws, the

Florida Civil Remedies for Criminal Practices Act, the Florida Deceptive and Unfair

Trade Practices Act, common law fraud, civil conspiracy, breach of fiduciary duties,

negligent misrepresentation and negligence.  All Defendants conspired to defraud and

commit other tortious wrongdoing against Plaintiff in connection with his purchases

and ownership of the common stock of Uniroyal Technology Corporation

("Uniroyal"), a Sarasota-based company.  Uniroyal has gone out of business, and its

assets have been liquidated in bankruptcy proceedings.  As a result, Uniroyal stock,

which formerly traded on the Nasdaq - National Market System under the ticker

symbol "UTCI," has become worthless.  Defendant Howard R. Curd – the husband of
Defendant Eileen Curd and the father of Defendant Howard F. Curd – was the
Chairman and Chief Executive Officer ("CEO") of Uniroyal and one of its largest
shareholders.  As part of the Curd family conspiracy to manipulate Uniroyal stock,
Howard R. Curd made and caused to be made many material public misstatements
and omissions about Uniroyal and its business prospects.  Howard R. Curd made
similar false representations directly to Plaintiff's father, Felix Sabates, and Plaintiff
relied on these misrepresentations.  Defendant Howard F. Curd – the son of
Defendant Howard R. Curd and the stepson of Defendant Eileen Curd – was the
President, CEO and sole owner of Defendant Jesup & Lamont Securities Corporation
("Jesup & Lamont"), a registered broker-dealer and one of only a few market-makers
in Uniroyal stock.  Howard F. Curd manipulated the price of Uniroyal stock through,
among other things, a fraudulent pattern of sham trades executed through securities
accounts he controlled and beneficially owned at Jesup & Lamont.  Defendant Eileen
S. Curd was Plaintiff's registered representative or broker at Jesup & Lamont.  While
acting as the Sabates broker, Eileen Curd participated in the manipulation of Uniroyal
stock and made many material misstatements and omissions to Plaintiff in connection
with his purchases and ownership of Uniroyal stock.  Defendant KC May Securities
Corporation ("KC May") is a successor-in-interest to Jesup & Lamont.  Defendants
Jesup & Lamont and KC May are thus vicariously liable for the wrongs committed by
their employees, including Defendants Howard F. Curd and Eileen Curd.  In turn,
Howard F. Curd and Eileen Curd are, or were at all relevant times, control persons of

Jesup & Lamont and KC May and are liable for the wrongdoing committed by those companies.

## **THE PARTIES**

2.     Plaintiff Mario Sabates purchased Uniroyal stock through a securities account he maintained at Jesup & Lamont, for which Defendant Eileen Curd was the broker.   Plaintiff is the son of Felix and Carolyn Sabates, who also invested in Uniroyal stock in reliance on misrepresentations and omissions made directly to one or both of them by Eileen Curd, Jesup & Lamont and Howard R. Curd.   Plaintiff likewise invested in Uniroyal stock in reliance on information and advice provided by Eileen Curd, Jesup & Lamont and indirectly Howard R. Curd.   He incurred substantial damages from investing in Uniroyal stock as a result of Defendants' fraudulent and wrongful conduct.  Mario Sabates is a citizen of Florida.

3.     At all relevant times, Defendant Howard R. Curd was the Chairman and CEO of Uniroyal Technology Corporation.   In August 2002, Uniroyal and affiliated companies filed Chapter 11 bankruptcy petitions with the United States Bankruptcy Court for the District of Delaware, which were later converted into Chapter 7 liquidation proceedings.   Uniroyal's liquidation concluded in or about October 2003.  Defendant Howard R. Curd is the husband of Defendant Eileen Curd and the father of Defendant Howard F. Curd.  Defendant Howard R. Curd was the President and CEO of Jesup & Lamont before turning over its management and ownership to his son.  Howard R. Curd is a citizen of Florida, and may be served at

the following address: 415 L'Ambiance Drive, Apartment A-901, Longboat Key, Florida 34228-3908.

4.     At all relevant times, Defendant Howard F. Curd was the President and CEO of Jesup & Lamont, and was, directly or indirectly, its sole owner.  He was registered representative and principal at Jesup & Lamont, CRD # 1786714.   On information and belief, Defendant Howard F. Curd is the 100% owner of Defendant KC May Securities Corporation.   Defendant Howard F. Curd is the stepson of Defendant Eileen Curd and the son of Defendant Howard R. Curd.  On information and belief, Defendant Howard F. Curd, directly or indirectly, acquired his ownership interest in Jesup & Lamont from his father.  Defendant Howard F. Curd is a citizen of New York, and may be served at the following address: 18 Elm Sea Lane, Manhasset, New York 11030-1009.

5.     At all relevant times, Defendant Eileen S. Curd was a registered representative or broker, CRD # 418750, with Defendant Jesup & Lamont. (The records for Ms. Curd maintained by the National Association of Securities Dealers ("NASD") appear under her maiden name of "Eileen Sena.")  Ms. Curd was the broker for all the accounts maintained by Plaintiff and his parents at Jesup & Lamont, and managed Jesup & Lamont's branch office in Sarasota.  One business directory lists Ms. Curd as the owner of Jesup & Lamont's Sarasota office, and she held herself out to Plaintiff and his parents as such.  As Plaintiff's broker, Ms. Curd owed him fiduciary duties.  Ms. Curd is the wife of Defendant Howard R. Curd and the stepmother of Defendant Howard F. Curd.  Ms. Curd is a citizen of Florida, and may

- 4 -

be served at the following address: 415 L'Ambiance Drive, Apartment A-901, Longboat Key, Florida 34228-3908.

6. Defendant Jesup & Lamont is a broker-dealer registered with the NASD, CRD # 39056. Jesup & Lamont is responsible for the fraudulent and other misconduct committed by its employees, including Howard F. Curd, Eileen Curd and Vincent J. Glinski. Jesup & Lamont is a corporation organized and existing under the laws of Washington with its principal place of business in New York. Jesup & Lamont may be served at the following address: 650 Fifth Avenue, Third Floor, New York, New York 10019.

7. Defendant KC May Securities Corporation ("KC May") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York. Although it appears that it has let its corporate registration and securities license lapse, KC May formerly was a broker-dealer registered with the NASD, CRD # 17833. On information and belief, KC May is a successor in interest to Defendant Jesup & Lamont. KC May may be served at the following address: c/o Jesup & Lamont Securities Corporation, 650 Fifth Avenue, ATTN: Howard F. Curd, New York, New York 10019.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa based upon Defendants' violations of the Sections 10(b) and 20 of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

Mario Sabates Complaint.doc

§§ 78j(b) and 78t, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5. The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to claims involved in the action occurred within the Middle District of Florida.

10.     Venue is also proper in this Court pursuant to 15 U.S.C. § 78aa because at least one act or transaction constituting a violation of the Exchange Act and the rules and regulations promulgated thereunder occurred within the Middle District of Florida.

## FACTUAL BACKGROUND

A.      The Curds Exercise Longstanding Overlapping and Interlocking
         Control and Ownership of Jesup & Lamont and Uniroyal.

11.     From 1981 through March 1993, Defendant Howard R. Curd was CEO, President (from September 1991), Chairman of the Board and a director of The Jesup Group, Inc., the parent of the companies that later became Uniroyal. For a time, The Jesup Group traded on the Nasdaq stock market under the ticker symbol "JGRP."

12.     As of no later than 1986, Defendant Howard R. Curd controlled Defendant Jesup & Lamont, and served as President and CEO of its indirect corporate parent, Jesup & Lamont Holding Company. On information and belief, Jesup & Lamont Holding Company was also a wholly-owned subsidiary of The Jesup Group.

13.     In late 1986, The Jesup Group acquired Uniroyal, which was then known as Uniroyal Plastics Co. Inc.  At that time, Uniroyal's core business consisted of manufacturing coated fabrics, including, most notably, a vinyl-treated simulated leather fabric marketed under the Naugahyde brand name.  On information and belief, Uniroyal Plastics Co. was later merged into Polycast Technology Corporation ("Polycast"), or one of its affiliates, another company controlled by Howard R. Curd through The Jesup Group.

14.     In May 1987, The Jesup Group acquired Jesup & Lamont Holding Company.

15.     In 1988, The Jesup Group sold off its securities operations, apparently including Defendant Jesup & Lamont, to a management group led by Howard F. Curd.

16.     On information and belief, in 1990, ownership and control of Jesup & Lamont reverted to Howard R. Curd, who, again, in 1991, turned over ownership and control to his son Howard F. Curd.

17.     In or about November 1990, Eileen Curd, then known as Eileen Sena, came to Jesup & Lamont from a rival firm to head its Institutional Service and Research Group.  Sometime thereafter, Eileen Curd married Howard R. Curd.

18.     In October and November 1991, Polycast and affiliated companies controlled by Howard R. Curd filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division.

19.    In or about September 1992, Polycast and its affiliates substantially consummated a plan of reorganization that resulted in the creation of Uniroyal.  At that time, Howard R. Curd became CEO of Uniroyal and Chairman of its Board of Directors.

20.    From January 1991 to February 2002, Howard F. Curd worked at Jesup & Lamont.  During this time, he owned 100% of Jesup & Lamont and was its President and CEO.

21.    On information and belief, Howard R. Curd and/or Howard F. Curd controlled, directly or indirectly, numerous other subsidiaries and affiliates of The Jesup Group, Jesup & Lamont Holding Company and/or Jesup & Lamont – most of which had "Jesup" in their names – including Jesup & Lamont Group Holdings Inc., Jesup & Lamont Securities Group, Inc., Jesup & Lamont Clearing Corporation, Jesup & Lamont Capital Markets, Inc., Jesup & Lamont Certified Capital L.L.C.

**B.**    **Howard R. Curd Purports to Convert Uniroyal into a High Technology Company, and Makes Materially False and Misleading <u>Statements in Order to Inflate the Value of Uniroyal Stock.</u>**

22.    At all relevant times, Howard R. Curd was the one of the largest Uniroyal shareholders, owning as much as 11.10% of Uniroyal's common stock.  At the peak of the market in February 2000, Howard R. Curd's Uniroyal shares had a value of more than $200 million.  In addition, as CEO and Chairman, Howard R. Curd received annual compensation from Uniroyal for fiscal years 1998 to 2000 ranging from approximately $1 million to over $2.6 million, excluding substantial awards of stock options.

- 8 -

23.     Realizing that the core Naugahyde business had little or no potential for significant growth, Howard R. Curd sought in 1998 to reposition Uniroyal from a plastics and specialty chemicals company to a high technology company focused primarily on high technology lighting solutions and silicon carbide semiconductors. The primary vehicle for Uniroyal's attempted transformation was a joint venture with Emcore Corporation ("Emcore") to produce High Brightness Light Emitting Diodes (HB-LEDs) though a new company, Uniroyal Optoelectronics, LLC ("UOL").   In addition, Uniroyal acquired Sterling Semiconductor, Inc. ("Sterling"), a producer of single-crystal silicon carbide substrates.   These businesses made up the majority of Uniroyal's   newly-formed   Optoelectronics   and   Semiconductor   Division   (the "Division").

24.     From 1997 through May 2001, Howard F. Curd served on the Board of Managers of UOL, the joint venture between Uniroyal and Emcore.  On information and belief, from May 1995 until December 1997, both Howard F. Curd and Howard R. Curd were members of Emcore's Board of Directors.  For all or most of this period of time, Emcore was Uniroyal's largest shareholder.

25.     From at least February 8, 2000 through May 13, 2002, Howard R. Curd made and caused others to make, materially false and misleading statements about Uniroyal, in particular about the growth and business prospects of the Division.  For example, Howard R. Curd, in combination with other senior executives of Uniroyal whom he had hired and supervised, conditioned the market to believe that:  (a) UOL was capable of, and was in fact, mass producing commercially saleable HB-LEDs and

other products; (b) Sterling was a valuable asset; and (c) Uniroyal had the resources to facilitate Sterling's expansion into the production of devices based on the latter's silicon compound semiconductors.

26.     These statements were false and Howard R. Curd made or caused them to be made with the intent to inflate the market price for Uniroyal stock. In truth, the Division and all of Uniroyal's high technology prospects faced significant difficulties. For example, UOL was experiencing constant manufacturing difficulties and failed ever to mass-produce any commercially saleable HB-LEDs or other product. Similarly, Sterling, which was presented by Howard R. Curd as Uniroyal's means to enter the lucrative world of silicon carbide devices, was nothing more than a research and development company that was teetering on the edge of bankruptcy when Uniroyal purchased it. As with UOL, Sterling similarly failed to produce any of the products Howard R. Curd and others had conditioned the market to believe that Uniroyal was capable of developing. Furthermore, Uniroyal had neither the technical expertise nor the capital to support Sterling's R&D of silicon carbide-based devices.

27.     When the truth about Uniroyal's disastrous foray into the high technology sector was finally revealed (including the dismal prospects of the Division and Uniroyal's optoelectronics and semiconductor business), Uniroyal's stock price plunged. From a high closing price of $71.125 on February 23, 2000, Uniroyal stock closed at $0.48 on May 13, 2002.

28.     Starting on or about June 26, 2002, numerous class actions lawsuits alleging securities fraud and other misconduct have been filed against Uniroyal,

Howard R. Curd and others in this Court and other courts.   Several of these lawsuits have been consolidated under the lead case of *Bellocco v. Uniroyal Technology, et al.*, Civil Action No.: 8:02-CV-1141-T-27TBM (M.D. Fla. filed June 27, 2002).   Mario Sabates and his parents are within the putative plaintiff class, as defined in *Bellocco* and parallel cases.   These class action lawsuits have had the legal effect of tolling the statute of limitations for Plaintiff's claims against Howard R. Curd.

29.     On or about August 25, 2002, Uniroyal filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware. Subsequently, this Court stayed the class action lawsuits as to Uniroyal.   *See Bellocco*, Order dated September 27, 2002 (docket no. 28).

30.     On or about December 25, 2002, plaintiffs in the *Bellocco* case filed a Consolidated Class Action Complaint (docket no. 43; hereinafter referred to as the "Class Action Complaint," a copy of which is attached as Exhibit A).   The Sabates hereby incorporate by reference the Class Action Complaint, and, in particular, all the allegations therein pertaining to fraudulent acts and other misconduct committed by Howard R. Curd in connection with Uniroyal.

31.     On or about September 11, 2003, the Honorable Thomas B. McCoun III, United States Magistrate Judge, issued a Report and Recommendation in *Bellocco* denying in substantial part the motion to dismiss filed by Howard R. Curd and his codefendants (docket no. 67).

      C.      While Howard R. Curd Makes Materially False and Misleading Statements in Order to Inflate the Value of Uniroyal Stock, Howard F. <u>Curd and Jesup & Lamont Similarly Manipulate Its Stock.</u>

32.      At all relevant times, Howard F. Curd was the President and CEO of Jesup & Lamont, and its sole owner.

33.      Between August 2000 and September 2001, Howard F. Curd and other Curd family members maintained securities accounts at Jesup & Lamont that held Uniroyal stock.

34.      Jesup & Lamont and Uniroyal also had other significant financial connections. For instance, Uniroyal paid substantial fees to a subsidiary of Jesup & Lamont to serve as its exclusive financial advisor for several sizeable transactions, including the sales of three Uniroyal business segments. Furthermore, on or about May 16, 2001, at the behest of his father Howard R. Curd, Uniroyal's Chairman and CEO, Howard F. Curd was appointed to Uniroyal's Board of Directors. Howard F. Curd remained on the board until January 4, 2002.

35.      Before, after and during the time he was on Uniroyal's Board, Howard F. Curd caused Jesup & Lamont to engage in fraudulent and manipulative behavior in connection with its aggressive promotion of Uniroyal stock. From August 2000 through September 2001, Jesup & Lamont published eight research reports and notes (collectively, the "Reports") that it disseminated to the investing public, bearing the following dates: August 30, 2000; December 15, 2000; February 7, 2001; May 9, 2001; June 21, 2001; August 9, 2001; August 15, 2001; and September 24, 2001. Among other distribution methods, Jesup & Lamont posted the Reports on its Internet

- 12 -

website, blast faxed them, and used mailing lists to send them to investors and potential investors.

36.     Vincent J. Glinski, a research analyst employed by Jesup & Lamont, prepared the Reports. Howard F. Curd had supervisory oversight for Mr. Glinski, and was responsible for reviewing, editing and approving the Reports before their public dissemination.

37.     In each of the Reports, Jesup & Lamont failed to disclose the true financial condition of Uniroyal and other material information about the company. Such disclosures were necessary to make the Reports not misleading. Specifically, in the Reports, Jesup & Lamont failed to disclose material information about the Division and Uniroyal's optoelectronics and semiconductor business, including, but not limited to:   (a) the Division's operating results were dependent on the development of new products and securing production orders from customers for such new products; (b) the Division had limited operating history and operating losses; (c) Uniroyal had to achieve higher production capacities than competitor companies, who were larger, more experienced and better capitalized; and (d) Uniroyal needed money to sustain its capital expenditures.

38.     In each of the eight Reports, Jesup & Lamont failed to disclose other material information, including but not limited to:  (a) the family relationship between Defendants Howard F. Curd and Howard R. Curd;  (b) the business relationships between their companies, Jesup & Lamont and Uniroyal; and (c) the fact that several Curd family members had investment accounts with Jesup & Lamont that contained

Uniroyal stock.  In addition, in the Reports dated June 21, 2001, August 9, 2001, August 15, 2001 and September 24, 2001, Jesup & Lamont failed to disclose that Uniroyal had appointed Howard F. Curd to its Board of Directors.  All these disclosures were necessary to make the Reports not misleading.

39.     In addition, in the Report dated December 15, 2000, Jesup & Lamont intentionally changed the valuation methodology utilized in the preceding Report, by adding Uniroyal's cash balance per share.  In the Report dated February 7, 2001, Jesup & Lamont again intentionally changed the valuation methodology by shifting the measuring period from calendar year to fiscal year.  Each of these changes increased Uniroyal's sales and target price.  Disclosure of the change in Jesup & Lamont's valuation methodology in the Reports dated December 15, 2000 and February 7, 2001 was necessary to make these Reports not misleading.

40.     In issuing the Reports, Jesup & Lamont included exaggerated, unwarranted and misleading statements about Uniroyal.  These statements, which Jesup & Lamont knew or should have known were misleading, were material and resulted in the dissemination of misleading communications to the investing public.

41.     In the Reports dated August 30, 2000, December 15, 2000 and February 7, 2001, Jesup & Lamont calculated a valuation for Uniroyal through a comparable company analysis.  The companies Jesup & Lamont selected, however, had much higher market capitalizations, cash and sales than Uniroyal, which caused the comparisons to be misleading.

42.     In the Report dated September 24, 2001, Jesup & Lamont upgraded Uniroyal from a "buy" to a "strong buy." Such recommendation was unwarranted and misleading in that Jesup & Lamont failed to provide any reasonable basis for the recommendation, and failed to explain the recommendation in light of Uniroyal's negative earnings per share estimates of -$0.67 for 2001 and -$0.21 for 2002.

43.     In the Report dated August 30, 2000, Jesup & Lamont projected a target price for Uniroyal of $57 for fiscal year 2002. This projection was unwarranted and misleading in that Jesup & Lamont failed to provide any reasonable basis for the target price, and failed to explain the projection in light of Uniroyal's negative earnings per share estimates for fiscal year 2001.

44.     In the Reports dated June 21, 2001, August 9, 2001, August 15, 2001 and September 24, 2001, Jesup & Lamont failed to provide an adequate justification for Jesup & Lamont's 12-month target price of $13 per share, which rendered such prediction unwarranted and misleading.

45.     In the Reports dated August 30, 2000; December 15, 2000; February 7, 2001; May 9, 2001 and August 15, 2001, Jesup & Lamont published sales predictions for Uniroyal's optoelectronics and semiconductor business of:  $2,800,000 for fiscal year 2000, representing a 477% annual growth rate; $28,800,000 for fiscal year 2001, representing a 906% annual growth rate; and $55,000,000 for fiscal year 2002, representing a 90% annual rate.  These sales and growth rate estimates were misleading and fraudulent in that Jesup & Lamont had no reasonable basis for making

- 15 -

such astronomical predictions, in light of, among other things, the fact that Uniroyal had not yet received any production orders for these products.

46.     As a registered broker-dealer and member of the NASD, Jesup & Lamont was required to comply with the NASD's Conduct Rules.   As Jesup & Lamont's President and CEO, a registered representative and securities principal, Howard F. Curd was required himself to comply with the NASD Conduct Rules, and had ultimate responsibility for ensuring that Jesup & Lamont complied with the NASD Conduct Rules.   Jesup & Lamont and Howard F. Curd violated the NASD Conduct Rules through the issuance of the Reports.

47.     Between December 2000 and August 2001, Howard F. Curd effected approximately twelve sham trades having no economic substance – trades commonly known as "wash trades" – in Uniroyal stock between personal and corporate accounts at Jesup & Lamont that he controlled and beneficially owned.   In all these trades, no change in beneficial ownership occurred.   Jesup & Lamont reported approximately eleven of the twelve "wash trades" in Uniroyal stock to the Nasdaq stock market as legitimate trading volume.   The twelve wash trades executed by Howard F. Curd through Jesup & Lamont created the false appearance of trading volume and market interest in Uniroyal stock.   Howard F. Curd and Jesup & Lamont executed these wash trades with the intent to inflate and manipulate Uniroyal's stock price.

48.     Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and SEC Rules 16a-2 and 16a-3 promulgated thereunder, 17 C.F.R. §§ 240.16a-2 & .16a-3, require the officers and directors of the issuers of any registered equity security to file a

Mario Sabates Complaint.doc

statement with the SEC, on SEC Form 3, within ten days of becoming an officer or director reporting the amount of all equity securities of such issuer of which they are a beneficial owner.   Thereafter officers and directors must report changes in their beneficial ownership of the issuer's securities within ten days after the close of each calendar month on SEC Form 4.   In addition, officers and directors must file an annual statement reflecting their beneficial ownership of the issuer's securities on SEC Form 5.

49.   Howard F. Curd served on Uniroyal's Board of Directors from approximately May 16, 2001 to January 4, 2002.   While serving as a director of Uniroyal, Howard F. Curd filed a false SEC Form 3 and a false SEC Form 5 on which he failed to report Uniroyal shares that he beneficially owned and controlled. Furthermore, despite selling and purchasing shares of Uniroyal while serving on its board, Howard F. Curd never filed a SEC Form 4.   By filing false SEC Forms 3 and 5, and by failing ever to file a SEC Form 4, Howard F. Curd violated:   (a) Section 16(a) of the Securities Exchange Act and SEC Rules 16a-2 and 16a-3 promulgated thereunder; and (b) the NASD Conduct Rules.

50.   On or about November 5, 2003, the NASD's Department of Enforcement filed a Complaint against Howard F. Curd, Vincent Glinski and Joseph P. Shanahan, Jesup & Lamont's former Chief Operating Officer, in Disciplinary Proceeding No. CAF030056 charging Howard F. Curd with manipulating Uniroyal stock in violation of Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, and additional serious misconduct

committed in connection with Uniroyal while he was President and CEO of Jesup and Lamont. The NASD's Complaint indicated that Howard F. Curd had a prior history of disciplinary actions in the securities industry, including an action brought by the New York Stock Exchange ("NYSE") for net capital violations, failing to file required regulatory reports, and inadequate supervision, which was settled by consent in June 1995. On information and belief, Howard F. Curd paid a $10,500 fine to settle the NYSE's disciplinary action.

> D.   Eileen Curd Conspires With Howard R. Curd, Howard F. Curd and Jesup & Lamont to Manipulate Uniroyal Stock, and Defrauds Plaintiff in Connection with His Purchases and Ownership of Uniroyal Stock.

51.    Sometime in the late 1980s or early 1990s, Plaintiff's parents, Felix and Carolyn Sabates, met and became social acquaintances of Eileen and Howard R. Curd.

52.    Thereafter, at the strong urging of Eileen and Howard R. Curd, Mr. and Mrs. Sabates were induced to open a securities account at Jesup & Lamont, and over time actually maintained several accounts at Jesup & Lamont. Felix and/or Carolyn Sabates were the beneficial owners of these accounts at all times. Ms. Curd also induced Plaintiff to open an account at Jesup & Lamont to buy and sell Uniroyal stock.

53.    In November 1997, Plaintiff made his first purchases of Uniroyal stock, based on the strong recommendation of Eileen and Howard R. Curd.

54.    During the period from February 2000 until Uniroyal's bankruptcy filing in August 2002, as Uniroyal's stock price declined by 99% from over $71 to

Mario Sabates Complaint.doc

$0.10 or less, Eileen Curd repeatedly touted Uniroyal stock to Plaintiff and his parents, and, in particular, she emphasized Uniroyal's transition to a high technology company, its HB-LED business, and the growth prospects created by the Division. During this same period, Howard R. Curd made similar representations on several occasions directly to Felix Sabates, who, in turn, relayed these representations to Plaintiff. All these representations were materially false and misleading, and Eileen Curd and Howard R. Curd made them knowing that they were false and misleading.

55.     At no time did Eileen Curd or Howard R. Curd ever disclose to Plaintiff or his parents, among other things:  (a) the fact that the Curd family and Jesup & Lamont were manipulating Uniroyal stock; (b) the massive web of intertwining and disabling conflicts of interest between the Curd family, Uniroyal and Jesup; and (c) the fact that Uniroyal never had a commercially saleable HB-LED product.

56.     As Uniroyal stock experienced its steep decline, Eileen Curd repeatedly insisted that the Sabates family not sell their Uniroyal stock, and all but prohibited them from selling even small amounts.  Ms. Curd told Plaintiff on several occasions that he could not sell his Uniroyal shares because it would cause the market price to decline even further.  Only when Plaintiff was faced with substantial margin calls that would have involuntarily wiped out his Uniroyal's holdings, did Ms. Curd permit him to sell, but even then Ms. Curd devised an arrangement whereby Felix Sabates would buy Mario's shares.  It is unclear whether these purchases/sales between the Sabates's accounts were ever publicly reported.

57.     In reliance on the misrepresentations and omissions of Eileen Curd and Howard R. Curd, as described above, Felix and Carolyn Sabates purchased 37,500 Uniroyal shares at a price of $8.11/share on or about February 1, 2001, for a total purchase price of $304,231, including brokerage fees.  These shares were transferred from the account of Mario Sabates at Jesup & Lamont, as part of the previously described transfer arrangement devised by Eileen Curd, apparently to avoid public disclosure of Mario Sabates's sale of Uniroyal stock.

58.     In reliance on the misrepresentations and omissions of Eileen Curd and, indirectly, Howard R. Curd, as described above, Plaintiff purchased 21,000 Uniroyal shares at a price of $8.11/share on or about February 1, 2001 (the "2/1/01 MS Purchase"), for a total purchase price of $170,415.80, including brokerage fees.

59.     In reliance on the misrepresentations and omissions of Eileen Curd and, indirectly, Howard R. Curd, as described above, Mario Sabates purchased 68,000 Uniroyal shares at a price of $5.78/share on or about February 5, 2001 (the "2/5/01 MS Purchase"), for a total purchase price of $393,040, including brokerage fees.

60.     On or about June 14, 2001, Felix Sabates faxed Eileen Curd at Jesup & Lamont's Sarasota office a list of the securities holdings in his joint account with Carolyn Sabates at Jesup & Lamont, which included 112,500 shares of Uniroyal stock.  In the fax, Felix Sabates expressly stated that he anticipated further declines in Uniroyal's stock price, and that he desired to sell all 112,500 shares.  Shortly after sending this fax, Felix Sabates spoke with Eileen Curd by telephone.  Once again, Ms. Curd all but forbid the Sabates from selling any of their stock, and she reassured Felix

- 20 -

Sabates with materially false misrepresentations and omissions, including that: (a) Uniroyal was "a $25 stock," when its stock was then trading at approximately $8.70/share; (b) Uniroyal's business prospects and outlook continued to be strong; and (c) Uniroyal's stock price had suffered only as a result of the general market decline in the technology sector, and that Uniroyal's price would recover when the overall market recovered.

61.    Contemporaneously, in June 2001, Mario Sabates similarly had a series of conversations with Eileen Curd at Jesup & Lamont during which he told Ms. Curd that he planned to sell all his Uniroyal stock, which then amounted to 89,000 shares. During these conversations, Ms. Curd all but forbid Mario Sabates from selling any of his stock, and reassured him with materially false misrepresentations and omissions, including that: (a) Uniroyal was "a $25 stock," when its stock was then trading at approximately $8.70/share; (b) Uniroyal's business prospects and outlook continued to be strong; and (c) Uniroyal's stock price had suffered only as a result of the general market decline in the technology sector, and that Uniroyal's price would recover when the overall market recovered.

62.    In reliance on the misrepresentations and omissions of Eileen Curd and, indirectly, Howard R. Curd, as described above, Mario Sabates made four separate purchases of Uniroyal stock, totaling 6,000 shares, at prices ranging from $5.98 to $6.00/share on or about August 13, 2001 (the "8/13/01 MS Purchases"), for a total purchase price of $36,167.25, including brokerage fees.

63.     In reliance on the misrepresentations and omissions of Eileen Curd and Howard R. Curd, as described above, Felix and Carolyn Sabates purchased 95,000 Uniroyal shares at a price of $2.67/share on or about September 21, 2001, for a total purchase price of $254,001, including brokerage fees.  These shares were transferred from the account of Mario Sabates at Jesup & Lamont, as part of the previously described transfer arrangement devised by Eileen Curd, apparently to avoid public disclosure of Mario Sabates's sale of Uniroyal stock.

E.     Uniroyal Liquidates All Its Assets, Its Stock Becomes Worthless, and Howard R. Curd Buys the Naugahyde Business Out of the Bankruptcy <u>Proceedings to Be Managed by His Son Howard F. Curd.</u>

64.     On or about August 25, 2002, Uniroyal filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware.

65.     According to a Form 8-K Uniroyal filed with the SEC dated October 17, 2003, "[i]t is not anticipated that the Company's stockholders and holders of unsecured and administrative claims will receive any recovery in the bankruptcy proceedings."

66.     On or about October 30, 2003, Uniroyal ceased operations.  On or about the same date, the Delaware bankruptcy court issued an order converting Uniroyal's Chapter 11 reorganization cases into a Chapter 7 liquidation.

67.     In an auction conducted by the Delaware bankruptcy court in October 2003, a private equity firm, Five Points Partners LLC ("Five Points"), purchased the Uniroyal division, Uniroyal Engineered Products, which manufactures vinyl-coated fabrics, including Naugahyde.  According to news reports, the President of Five

Points is Howard F. Curd, and one of Five Points' principal equity investors is his father, Howard R. Curd.

## COUNT I
## SECURITIES FRAUD
## (SEC RULE 10B-5 –
## MISSTATEMENTS AND OMISSIONS)
## AGAINST ALL DEFENDANTS

68.     Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 67 above.

69.     Defendants Howard R. Curd, Eileen Curd and Jesup & Lamont (though Eileen Curd) knowingly or, at a minimum, recklessly made numerous material misrepresentations and omissions to Plaintiff and his parents in connection with the following purchases of Uniroyal stock:   the 2/1/01 MS Purchase; 2/5/01 MS Purchase; and the 8/13/01 MS Purchases.   Defendants have thus violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5.   Defendants had ample motivation to make these misrepresentations and omissions for many reasons, including to inflate and protect artificially the value of Uniroyal stock held by Howard R. Curd and other Curd family members, which at one time exceeded $200 million, and to preserve the substantial compensation Howard R. Curd was receiving as Uniroyal's Chairman and CEO.

70.     Plaintiff relied on the misrepresentations and omissions made by these Defendants, and has thereby incurred substantial damages as a direct and proximate result.

71.     Defendants Howard F. Curd and Eileen Curd acted as controlling persons of Jesup & Lamont within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78o.  By reason of their executive positions and ownership, Howard F. Curd and Eileen Curd had the power and authority to cause and did cause Jesup & Lamont to engage in the wrongful conduct complained of herein.   Accordingly, Howard F. Curd and Eileen Curd are liable to Plaintiff as controlling persons of Jesup & Lamont.

72.     On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

**COUNT II**
**SECURITIES FRAUD**
**(SEC RULE 10B-5 –**
**MARKET MANIPULATION)**
**AGAINST ALL DEFENDANTS**

73.     Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 72 above.

74.     Defendants Howard R. Curd, Howard F. Curd, Eileen Curd and Jesup & Lamont knowingly or, at a minimum, recklessly manipulated Uniroyal stock, though among other things, the wash trades executed by Howard F. Curd, the fraudulent Reports issued by Jesup & Lamont, and the material misstatements and omissions that Howard R. Curd made or caused to be made as set forth above and in the Class Action Complaint.  These Defendants thereby violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they employed a device, scheme, or artifice to defraud and/or they engaged in an act, practice, or

- 24 -

course of business which operated as a fraud or deceit upon Plaintiff.  Defendants had ample motivation to manipulate Uniroyal stock, including to inflate and protect artificially the Uniroyal stockholdings of Howard R. Curd and other Curd family members, which at one time had a value in excess of $200 million, and to preserve the substantial compensation Howard R. Curd was receiving as Uniroyal's Chairman and CEO.

75.     Plaintiff was unaware of Defendants' manipulation and relied on the integrity of the market for Uniroyal stock.  Plaintiff purchased his Uniroyal stock at inflated prices and incurred substantial damages as a direct and proximate result.

76.     Defendants Howard F. Curd and Eileen Curd acted as controlling persons of Jesup & Lamont within the meaning of Section 20(a) of the Exchange Act. By reason of their executive positions and ownership, Howard F. Curd and Eileen Curd had the power and authority to cause and did cause Jesup & Lamont to engage in the wrongful conduct complained of herein.   Accordingly, Howard F. Curd and Eileen Curd are liable to Plaintiff as controlling persons of Jesup & Lamont.

77.     On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

**COUNT III**
**FLORIDA CRCPA**
**(FLA. STAT. ANN. § 772.103(1) & (2))**
**AGAINST ALL DEFENDANTS**

78.     Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 77 above.

79.    Defendants Howard R. Curd, Howard F. Curd, Eileen Curd and Jesup & Lamont have violated Florida Statutes Annotated § 772.103, which is part of the "Civil Remedies for Criminal Practices Act."  In particular, these Defendants have violated the CRCPA § 772.103(1) and (2) by: (a) with criminal intent, receiving proceeds derived, directly or indirectly, from a pattern of criminal activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the establishment or operation of an enterprise, i.e., Uniroyal; and/or (b) through a pattern of criminal activity, acquiring or maintaining, directly or indirectly, any interest in or control of an enterprise, i.e., Uniroyal.

80.    Defendants' pattern of criminal activity under CRCPA § 772.102(1)(a)(5) – the predicate acts – include the following securities offenses under Florida law, Chapter 517:   (a) the misrepresentations and omissions about Uniroyal stock that Howard R. Curd made or caused to be made, directly and indirectly, to the investing public, Plaintiff and his parents as set forth above and in the Class Action Complaint; (b) the wash trades in Uniroyal stock executed by Howard F. Curd through securities accounts he controlled and beneficially owned at Jesup & Lamont; (c) the misrepresentations and omissions about Uniroyal stock that Eileen Curd made to the Sabates family; and (iv) the Reports issued by Jesup & Lamont that fraudulently touted Uniroyal stock.

81.    Plaintiff has sustained damages as a direct and proximate result of these Defendants' violations of CRCPA § 772.103(1) and (2).

82.     As a result, these Defendants are liable to Plaintiff under CRCPA § 772.104, and Plaintiff may recover threefold his actual damages sustained and reasonable attorney's fees and court costs in the trial and appellate courts.

83.     On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

### COUNT IV
### FLORIDA CRCPA
### (FLA. STAT. ANN. § 772.103(4))
### AGAINST ALL DEFENDANTS

84.     Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 83 above.

85.     Defendants Howard R. Curd, Howard F. Curd, Eileen Curd and Jesup & Lamont have violated CRCPA § 772.103(4), which makes it unlawful to conspire or endeavor to violate any of the provisions of subsection (1) or subsection (2).  As set forth above, as part of their manipulation of Uniroyal stock, these Defendants have conspired:  (a) with criminal intent, to receive proceeds derived, directly or indirectly, from a pattern of criminal activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the establishment or operation of an enterprise, i.e., Uniroyal; and/or (b) through a pattern of criminal activity, to acquire or maintain, directly or indirectly, any interest in or control of an enterprise, i.e., Uniroyal.

86.     Plaintiff has sustained damages as a result of these Defendants' violations of CRCPA § 772.103(4).

Mario Sabates Complaint.doc

87.     As a result, these Defendants are liable to Plaintiff under CRCPA § 772.104, and Plaintiff may recover threefold his actual damages sustained and reasonable attorney's fees and court costs in the trial and appellate courts.

88.     On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

## COUNT V
## SECURITIES FRAUD
## (FLA. STAT. ANN. §§ 517.301(1))
## AGAINST ALL DEFENDANTS

89.     Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 88 above.

90.     Defendants Howard R. Curd, Howard F. Curd, Eileen Curd and Jesup & Lamont have violated Florida Statutes Annotated § 517.301(1) by, among other things: (a) making numerous misstatements and omissions regarding Uniroyal stock to the investing public, Plaintiff and his parents; and (b) conspiring to manipulate and manipulating Uniroyal stock.

91.     Plaintiff has sustained damages as a result of Defendants' violations of Florida Statutes Annotated § 517.301(1).

92.     These Defendants are thus liable to Plaintiff under Florida Statutes Annotated §§ 517.211(2) and 517.312(2).

93.     On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

94.     The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

**COUNT VI**
**SECURITIES FRAUD/BOILER ROOM**
**(FLA. STAT. ANN. §§ 517.312(1)(B))**
**AGAINST HOWARD R. CURD,**
**HOWARD F. CURD AND EILEEN CURD**

95.     Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 94 above.

96.     Defendants Howard R. Curd, Howard F. Curd and Eileen Curd have violated Florida Statutes Annotated § 517.312(1)(b), which makes it unlawful "[t]o directly or indirectly manage, supervise, control, or own, either alone or in association with others, any boiler room in this state which sells or offers for sale any security or investment in violation of [§ 517.312(1)(a)]."

97.     During the period Plaintiff and his parents made their purchases of Uniroyal stock, Jesup & Lamont was a boiler room within the meaning of Florida Statutes Annotated § 517.312(1)(b).

98.     During this same period, Defendants Howard R. Curd, Howard F. Curd and Eileen Curd all directly or indirectly managed, supervised, controlled or owned,

either alone or in association with others, Jesup & Lamont, a boiler room in Sarasota, Florida, which sold Uniroyal stock in violation of Florida law.

99.   Plaintiff has sustained damages as a result of Defendants' violations of Florida Statutes Annotated § 517.312(1)(b).

100.   These Defendants are thus liable to Plaintiff under Florida Statutes Annotated § 517.312(2).

101.   The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

**COUNT VII**
**COMMON LAW FRAUD**
**AGAINST**
**HOWARD R. CURD, EILEEN CURD**
**JESUP & LAMONT AND KC MAY**

102.   Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 101 above.

103.   In connection with Plaintiff's purchases and ownership of Uniroyal stock, Defendants Howard R. Curd, Eileen Curd and Jesup & Lamont knowingly made numerous material misstatements and omissions about, among other things: (a) the business prospects created by Uniroyal's transition into a high technology company; (b) the development of Uniroyal's HB-LED business; and (c) the other

- 30 -

growth prospects created by the Division, i.e., Uniroyal's overall optoelectronics and semiconductor business.

104.    At no time did these Defendants ever disclose to Plaintiff, among other things:  (a) the fact that the Curd family and Jesup & Lamont were manipulating Uniroyal stock; (b) the massive web of intertwining and disabling conflicts of interest between the Curd family, Uniroyal and Jesup; and (c) the fact that Uniroyal never had a commercially saleable HB-LED product.

105.    These Defendants made these material misrepresentations and omissions with the intent to induce Plaintiff to rely on them in deciding to purchase and hold Uniroyal stock.

106.    Plaintiff would have sold 89,000 shares of Uniroyal stock on or about June 14, 2001 except for his reliance on the misrepresentations made by Eileen Curd, acting as a broker employed by Jesup & Lamont, and indirectly by Howard R. Curd that:    (a) Uniroyal was "a $25 stock," when its stock was then trading at approximately $8.70/share; (b) Uniroyal's business prospects and outlook continued to be strong; and (c) Uniroyal's stock price had suffered only as a result of the general market decline in the technology sector, and that Uniroyal's price would recover when the overall market recovered.

107.    Plaintiff reasonably relied on the misrepresentations and omissions made by these Defendants in deciding to purchase and hold Uniroyal stock, and has thereby incurred substantial damages as a direct and proximate result.

108.   On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

109.   The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

## COUNT VIII
## CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS

110.   Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 109 above.

111.   With a malicious motive, Defendants Howard R. Curd, Howard F. Curd, Eileen Curd and Jesup & Lamont entered into a civil conspiracy to do an unlawful act or a lawful act through unlawful means, including, but not limited to their manipulation of Uniroyal stock and the material misrepresentations and omissions about Uniroyal stock they made to the investing public and the Sabates.

112.   One or more Defendants committed one or more overt acts in pursuance of this conspiracy, including, for example, the wash trades executed by Howard F. Curd in securities accounts he controlled and beneficially owned at Jesup & Lamont, the fraudulent Reports issued by Jesup & Lamont touting Uniroyal stock,

and the material misstatements and omissions about Uniroyal that Howard R. Curd and Eileen Curd made or caused to be made to the investing public and Plaintiff.

113.    Plaintiff has sustained substantial damages as a direct and proximate result of the unlawful conspiracy between and among these Defendants.

114.    On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

115.    The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

**COUNT IX**
**BREACHES OF FIDUCIARY DUTIES**
**AGAINST EILEEN CURD,**
**JESUP & LAMONT AND KC MAY**

116.    Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 115 above.

117.    As securities brokers, Defendants Eileen Curd and Jesup & Lamont stood in a fiduciary relationship to their customers, including Plaintiff.

118.    As a result of this fiduciary relationship, Eileen Curd and Jesup & Lamont owed Plaintiff duties of trust, confidence, loyalty and competence, among others.

119.    These Defendants violated fiduciary duties owed to Plaintiff in the management of Plaintiff's securities account at Jesup & Lamont and in connection with the advice given to Plaintiff in connection with his purchase and ownership of Uniroyal stock.

120.    Plaintiff has sustained substantial damages as a direct and proximate result of these Defendants' breaches of fiduciary duties.

121.    On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

122.    The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against these Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

## COUNT X
## AIDING AND ABETTING
## BREACHES OF FIDUCIARY DUTIES
## AGAINST HOWARD R. CURD
## AND HOWARD F. CURD

123.    Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 122 above.

124.    As securities brokers, Eileen Curd and Jesup & Lamont stood in a fiduciary relationship to their customers, including Plaintiff.  As a result of this fiduciary relationship, Eileen Curd and Jesup & Lamont owed Plaintiff duties of trust,

confidence, loyalty and competence, among others. Eileen Curd and Jesup & Lamont breached fiduciary duties they owed Plaintiff.

125.   Defendants Howard R. Curd and Howard F. Curd aided and abetted the breaches of fiduciary duties committed by Eileen Curd and Jesup & Lamont, in that, Howard R. Curd and Howard F. Curd knew of these breaches and rendered substantial assistance or encouragement of the wrongdoing.

126.   Plaintiff has sustained substantial damages as a direct and proximate result of the breaches of fiduciary duties that these Defendants aided and abetted.

127.   The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against these Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

**COUNT XI**
**NEGLIGENT MISREPRESENTATION**
**AGAINST**
**HOWARD R. CURD, EILEEN CURD,**
**JESUP & LAMONT AND KC MAY**

128.   Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 127 above.

129.   Defendants Howard R. Curd, Eileen Curd and Jesup & Lamont (through Eileen Curd) made false statements concerning material facts to Plaintiff

regarding Uniroyal and Uniroyal stock, which these Defendants knew or reasonably should have known were false.

130.   Plaintiff reasonably relied on the false statements made by these Defendants in connection with their decisions to purchase and hold Uniroyal stock. Plaintiff has thereby incurred substantial damages as a direct and proximate result.

131.   On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

132.   The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against these Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

**COUNT XII**
**NEGLIGENCE**
**AGAINST EILEEN CURD,**
**JESUP & LAMONT AND KC MAY**

133.   Plaintiff realleges verbatim and incorporate by reference herein the averments set forth in paragraphs 1 through 132 above.

134.   As securities brokers, Defendants Eileen Curd and Jesup & Lamont owed their customers, including Plaintiff, a duty of due care, which includes a duty to use the same degree of skill and care that other securities brokers would reasonably use under the same circumstances.

- 36 -

135. These Defendants breached duties owed to Plaintiff in connection with the management of Plaintiff's account at Jesup & Lamont and in the advice given to Plaintiff concerning Uniroyal stock.

136. The breaches of duties committed by these Defendants have caused Plaintiff to sustain substantial damages as a direct and proximate result of Defendants' negligence.

137. On information and belief, Defendant KC May is a corporate successor to Jesup & Lamont, and is liable to Plaintiff in that capacity.

138. The aforementioned actions of these Defendants amounted to intentional misconduct or gross negligence, as defined in Florida Statutes Annotated § 768.72(2), thereby entitling Plaintiff to recover punitive and exemplary damages from and against these Defendants, jointly and severally, in an amount deemed reasonable by the trier of fact, consistent with Florida Statutes Annotated § 768.73, to deter these Defendants from such wrongful conduct in the future.

WHEREFORE, Plaintiff respectfully prays for the following relief:

(1) That pursuant to Count I, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for securities fraud in violation of SEC Rule 10b-5, in an amount to be proven upon the trial of this case;

(2) That pursuant to Count II, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for securities fraud in violation of SEC Rule 10b-5, in an amount to be proven upon the trial of this case;

Mario Sabates Complaint.doc

(3)     That pursuant to Count III, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for violations of the Florida CRCPA in threefold their actual damages sustained, in an amount to be proven upon the trial of this case, and reasonable attorney's fees and court costs in the trial and appellate courts;

(4)     That pursuant to Count IV, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for violations of the Florida CRCPA in threefold their actual damages sustained, in an amount to be proven upon the trial of this case, and reasonable attorney's fees and court costs in the trial and appellate courts;

(5)     That pursuant to Count V, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for securities fraud in violation of the Florida Statutes Annotated §§ 517.301(1), in an amount to be proven upon the trial of this case, plus punitive damages and reasonable attorney's fees;

(6)     That pursuant to Count VI, judgment be entered in favor of Plaintiff and against Defendants Howard R. Curd, Howard F. Curd and Eileen Curd, jointly and severally, for securities fraud in violation of the Florida Statutes Annotated § 517.312(1), in an amount to be proven upon the trial of this case, plus punitive damages and reasonable attorney's fees;

(7)     That pursuant to Count VII, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for common law fraud, in an amount to be proven upon the trial of this case, plus punitive damages;

(8)     That pursuant to Count VIII, judgment be entered in favor of Plaintiff and against Defendants, jointly and severally, for civil conspiracy, in an amount to be proven upon the trial of this case, plus punitive damages;

(9)     That pursuant to Count IX, judgment be entered in favor of Plaintiff and against Defendants Eileen Curd, Jesup & Lamont and KC May, jointly and severally, for breaches of fiduciary duties, in an amount to be proven upon the trial of this case, plus punitive damages;

(10)    That pursuant to Count X, judgment be entered in favor of Plaintiff and against Defendants Howard R. Curd and Howard F. Curd, jointly and severally, for aiding and abetting breaches of fiduciary duties, in an amount to be proven upon the trial of this case, plus punitive damages;

(11)    That pursuant to Count XI, judgment be entered in favor of Plaintiff and against Defendants Howard R. Curd, Eileen Curd, Jesup & Lamont and KC May, jointly and severally, for negligent misrepresentation, in an amount to be proven upon the trial of this case, plus punitive damages;

(12) That pursuant to Count XII, judgment be entered in favor of Plaintiff and against Defendants Eileen Curd, Jesup & Lamont and KC May, jointly and severally, for negligence, in an amount to be proven upon the trial of this case, plus punitive damages;

(13)    That Plaintiff be awarded prejudgment interest as provided by law;

(14)    That Plaintiff be awarded all costs of this action; and

(15)    That Plaintiff be granted such other and further relief as this Court shall

deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests that this matter be tried before a jury on all

issues triable thereto.

This _16th_ day of April, 2004.

Respectfully submitted,

Robert R. Hearn
Fla. Bar No. 0067687
Joshua R. Heller
Fla. Bar No. 0502901
ZUCKERMAN SPAEDER LLP
101 East Kennedy Blvd., Suite 1200
Tampa, Florida 33602
813-221-1010
813-223-7961 (FAX)

Donald A. Loft, Trial Counsel
Georgia Bar No. 455706
Ross A. Albert
Georgia Bar No. 007749
MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA  30326
404-233-7000
404-365-9532 (FAX)

*Attorneys for Plaintiff Mario A. Sabates*

- 40 -

*FILED*

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA

---

ROSA BELLOCCO, on behalf of herself and all
others similarly situated,

        Plaintiff(s),

        v.

HOWARD R. CURD, ROBERT L. SORAN, and
GEORGE J. ZULANAS,

        Defendants.

---

**Civil Action No.: 8:02-CV-1141-T-27TBM**

**CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Lead Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their consolidated class action complaint (the "Complaint"), make the following allegations upon information and belief, based upon the facts set forth below, which were obtained through an extensive investigation made by and through their attorneys. Lead Plaintiffs' investigation included, among other things: a review and analysis of various public statements and filings made by Uniroyal Technology Corp. ("Uniroyal" or the "Company") and its senior officers with the Securities and Exchange Commission ("SEC") and the United States Bankruptcy Court for the District of Delaware; the reports of securities analysts concerning the Company; press releases, media reports, and other publicly available documents regarding the Company; and interviews with former employees of the Company and its former joint venture partner knowledgeable of the conduct complained of herein. Lead Plaintiffs believe that further substantial evidentiary support can be obtained to support the allegations set forth below after a reasonable opportunity for discovery.



EXHIBIT
A



## NATURE OF THE ACTION

1.      Lead Plaintiffs bring this action on behalf of themselves and all persons and entities who purchased or otherwise acquired the publicly-traded securities of Uniroyal on the open market between February 8, 2000 and May 13, 2002, inclusive ( the "Class Period"), and who were damaged thereby (the "Class").

2.      In 1998, Uniroyal, historically a producer of traditional chemicals and plastics, sought to transition to a high-tech company focusing primarily on the production of high technology lighting solutions and silicon carbide semiconductor products.  The primary vehicles for Uniroyal's transformation were a joint venture with Emcore Corp. ("Emcore" and the "Emcore JV," respectively) to produce High Brightness Light Emitting Diodes (HB-LEDs) and Uniroyal's acquisition of Sterling Semiconductor, Inc. ("Sterling"), a producer of single-crystal silicon carbide substrates.  These businesses made up the majority of the Company's newly-formed Optoelectronics and Semiconductor Division (sometimes referred to as the "Division").

3.      During the Class Period, Defendants issued a series of positive statements touting, among other things,  the current and future production capabilities of the Division and the Division's future prospects.  For example, Defendants conditioned the market to believe that (i) the Emcore JV was capable of, and was in fact, mass producing commercially saleable products; (ii) Sterling was a valuable asset; and (iii) Uniroyal had the resources to facilitate Sterling's expansion into the production of devices based on the latter's silicon compound semiconductors.

4.      Unbeknownst to the investing public, however, which purchased Uniroyal securities during the Class Period at artificially inflated prices, the Optoelectronics & Semiconductor Division was facing significant difficulties.  For example, the Emcore JV was

experiencing constant manufacturing difficulties and failed to ever mass produce any commercially saleable product. Similarly, Sterling, which was presented by Defendants as Uniroyal's portal into the lucrative world of silicon carbide devices, was nothing more than a research and development company that was teetering on the edge of bankruptcy when Uniroyal purchased it. As with the Emcore JV, Sterling similarly failed to produce any of the products Uniroyal had conditioned the market to believe it was capable of developing. Furthermore, Uniroyal had neither the technical expertise nor the capital to support Sterling's R&D of silicon carbide based devices.

5.      The true value of the Optoelectronics & Semiconductor Division was finally revealed to investors on December 31, 2001, when the Company disclosed that its buyout of Emcore's interest in the Emcore JV in August, 2001 forced it to revise its projections for the Division. Specifically, the Company had conducted an impairment analysis of Sterling and was, among other things, recording a write-down of Sterling goodwill of approximately $9,816,000. In response to the disclosures about the true value of the businesses that were supposed to turn Uniroyal into a leading high-tech company, the price of Uniroyal's stock fell to $1.69 per share on January 2, 2002, from $3.20 per share the previous day, and down substantially from its Class Period closing price high of $71.125 per share, on February 23, 2000. Subsequent disclosures during the next few months, which culminated in the disclosure that Sterling could not even be sold for $3 million, caused the per share price of the Company's stock to drop to pennies. On May 13, 2002, the close of the Class Period, the stock price of Uniroyal closed at $ 0.48 per share.

6.      The price of Uniroyal's stock has never recovered. On August 25, 2002, Uniroyal and certain of its affiliated companies filed for Chapter 11 reorganization.

3

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa).

8.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b)(17 C.F.R. § 240.10b-5).

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business in this District and substantial acts in furtherance of the alleged wrongdoing and/or its effects have occurred within this District. Uniroyal's principal executive offices are located in this District, where the day-to-day operations of the Company are directed and managed, and where certain key witnesses reside and/or are employed.

10.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

11.     Lead Plaintiffs Fuller & Thaler Asset Management and Dwight Tracy purchased Uniroyal common stock at artificially inflated prices during the Class Period, as set forth in the certifications attached hereto and incorporated herein by reference, and were damaged thereby.

12.     Defendant Howard R. Curd ("Curd") is, and was at the time of the events complained of herein, the Chairman of the Board and Chief Executive Officer of Uniroyal.  At the time that Uniroyal began its negotiations with Emcore regarding the formation of the joint

4

venture, Curd sat on Emcore's board of directors. According to representations made by Uniroyal in the bankruptcy proceeding, Curd has, and has had, "overall responsibility for the strategic direction of the company, and the financial makeup of the entire operation." During the Class Period, Curd issued materially false and misleading statements that were quoted frequently in the news media, press releases, and in other publicly disseminated materials. Curd also signed many of the SEC filings alleged herein to contain materially false and misleading statements and/or omissions.

13.     Defendant Robert L. Soran ("Soran") is, and was at the time of the events complained of herein, President, Director and Chief Operating Officer of Uniroyal. According to representations made by Uniroyal in the bankruptcy proceeding, Soran has, and has had, "overall responsibility for the operational health of the enterprise including its operating subsidiaries" and is intimately involved in the day-to-day operations of the Compound Semiconductor and Optoelectronics business segment. During the Class Period, Soran issued materially false and misleading statements that were quoted frequently in the news media, press releases, and in other publicly disseminated materials. Soran also signed many of the SEC filings alleged herein to contain materially false and misleading statements and/or omissions.

14.     Defendant George J. Zulanas, Jr. ("Zulanas") is, and was at the time of the events complained of herein, Executive Vice President, Chief Financial Officer and Treasurer of Uniroyal. According to representations made by Uniroyal in the bankruptcy proceeding, Zulanas has, and has had, "overall responsibility for the financial health and financial reporting of the company and its subsidiaries." During the Class Period, Zulanas issued materially false and misleading statements that were quoted frequently in the news media, press releases, and in other

publicly disseminated materials. Zulanas also signed many of the SEC filings alleged herein to contain materially false and misleading statements and/or omissions.

15.   During the Class Period, Defendants, as Uniroyal's officers and/or directors, were privy to confidential and proprietary information concerning Uniroyal, its operations, and business prospects. By reason of their positions with Uniroyal, Defendants had access to internal Company documents, reports, and other information, including, among other things, material, adverse, non-public, information concerning the production capabilities of the Optoelectronics & Semiconductor Division and the Company's true financial condition. According to the Company's recent Complaint for Declaratory and Injunctive Relief filed in the United States Bankruptcy Court for the District of Delaware, Defendants "have been responsible for managing Uniroyal for approximately ten years and possess detailed knowledge of the company, its subsidiaries and their operations." As a result of the foregoing, they were responsible for the truthfulness and accuracy of Uniroyal's pubic statements described herein.

16.   Defendants, as senior officers and/or directors of Uniroyal, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with Uniroyal, they were able to and did, directly or indirectly, in whole or in material part, control the content of public statements issued by or on behalf of the Company, including statements to securities analyst and financial reporters. As noted above, Defendants were responsible for managing the Company and its subsidiaries. They participated in and approved the issuance of such statements made throughout the Class Period, including the materially false and misleading statements identified herein. Moreover, Defendants are liable for the false statements pleaded at paragraphs 60-175, as those statements were each "group-published" information, the result of the collective action of the Defendants.

6

17.     Defendants, as officers and/or directors of a publicly-held company, had a duty to promptly disseminate truthful and accurate information with respect to the Company and the financial condition and manufacturing capabilities of the Optoelectronics and Semiconductor Division and to promptly correct any public statements issued by or on behalf of the Company that had become false and misleading, and to disclose any adverse trends that would materially affect the present and future operating prospects of the Company.

18.     The statements made by Defendants alleged below were materially false and misleading when made.  Defendants had no reasonable or adequate basis to justify or support the statements identified below concerning the Company's financial condition and the manufacturing capabilities of the Optoelectronics & Semiconductor Division.  The truth about the Company's financial condition and business prospects, which were known or were recklessly disregarded by Defendants, remained concealed from the investing public throughout the Class Period. Defendants who were under a duty to disclose those facts, misrepresented or concealed them during the Class Period.

19.     Each Defendant knew that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for Uniroyal's securities and would cause the price of these securities to become artificially inflated.  Each Defendant acted knowingly or recklessly in such a manner as to constitute a fraud and deceit upon the Lead Plaintiffs and the other members of the Class.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

20.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired Uniroyal's publicly-traded securities during the Class Period, and who were damaged

thereby. Excluded from the Class are Defendants, members of the immediate family of each

Defendant, any subsidiary or affiliate of Uniroyal and Uniroyal's directors and officers,

Uniroyal's or its subsidiaries or affiliates, or any entity in which any excluded person has a

controlling interest, and the legal representatives, heirs, successors and assigns of any excluded

person.

21.     The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this

time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there

are thousands of members of the Class geographically dispersed throughout the United States.

As of April 28, 2002, there were reportedly more than 28 million shares of Uniroyal common

stock outstanding.  Throughout the Class Period, Uniroyal common stock actively traded on the

Nasdaq National Market System ("NASDAQ").  Record owners and other members of the Class

may be identified from records maintained by Uniroyal and/or its transfer agents and may be

notified of the pendency of this action by mail, using a form of notice similar to that customarily

used in securities class actions.

22.     Lead Plaintiffs' claims are typical of the claims of the other members of the Class

as all members of the Class were similarly affected by Defendants' wrongful conduct in violation

of the federal law that is complained of herein.

23.     Lead Plaintiffs will fairly and adequately protect the interests of the members of

the Class and have retained counsel competent and experienced in class and securities litigation.

24.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws;

(b)    whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)    whether documents, press releases, and other statements disseminated to the investing public during the Class Period misrepresented material facts about Uniroyal's business, finances, financial condition, and prospects;

(d)    whether the market prices of Uniroyal securities during the Class Period were artificially inflated due to the material misrepresentations and omissions complained of herein; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this litigation as a class action.

26.    Lead Plaintiffs have no interests that conflict with those of the Class.

## BACKGROUND

**Uniroyal's Attempts To Transform Itself
Into A High Technology Company**

27.    Uniroyal began operations in 1992  primarily as a plastics and specialty chemicals company best known to consumers for, among other things, its Naugahyde line of vinyl coated fabrics and its adhesives and sealants products.  Beginning in 1998, Uniroyal sought to reposition

9

itself from a plastics and specialty chemicals company to a high technology company focused

primarily on high technology lighting solutions and silicon carbide semiconductors. In order to

reach this long-term goal, Uniroyal engaged in a number of strategic divestitures and

investments, including selling two plastics and chemical business segments.

28.     Uniroyal is currently organized into two primary business segments: (i) Coated

Fabrics, and (ii) Compound Semiconductors and Optoelectronics. The Coated Fabrics segment

manufactures a wide selection of plastic vinyl coated fabrics for use in furniture, transportation,

and automotive seating applications. The Compound Semiconductor and Optoelectronics

segments manufactures products used in HB- LEDs, high temperature and high voltage switches

and transformers. It is made up of Uniroyal Optoelectronics ("UOE"), NorLux Corp. and

Sterling.

**A. The Emcore JV**

29.     One of the primary vehicles for Uniroyal's transition to high technology was a

joint venture with Emcore to produce HB-LEDs. HB-LEDs are based on an emerging

technology, which was then, and is currently, experiencing a high rate of growth. They are solid-

state semiconductor devices that convert electrical energy directly into light. HB-LEDs are used

in a variety of applications, including traffic signals and other products with demanding

lumination requirements such as automobiles, indoor and outdoor signage--such as stadium

scoreboards--and backlighting for various consumer electronics devices, most notably cell

phones and video displays. HB-LEDs provide significantly longer luminosity longevity--up to

100,000 hours, compared to 2,000 hours for conventional incandescent bulbs. They are also

more energy efficient than conventional lighting, consuming only 10-15% of the power used by

incandescent bulbs, while also generating less heat. According to Uniroyal's bankruptcy filings,

10

Emcore was to be the "primary provider of the equipment and research and development expertise," while Uniroyal was to be "the primary provider of manufacturing expertise." Both parties were to be jointly responsible for the marketing aspects of the joint venture.

30.    According to Uniroyal's annual report on Form 10-K for the fiscal year ended September 26, 1999 (the "1999 Form 10-K"), Uniroyal

> manages and owns a 51% interest. Emcore is the 49% owner. In July 1998, both owners capitalized the joint venture through cash contributions of $510,000 by the Company and $490,000 by Emcore.
>
> During Fiscal 1999, Emcore made additional capital contributions to the joint venture of $5,500,000. The Company is required to fund its equivalent contribution of approximately $5,700,000 as cash is required by the joint venture.

31.    Under the Emcore JV, production of the HB-LEDs would take place at Uniroyal's production facility under the auspices of Uniroyal's newly-formed UOE segment. Uniroyal created a state-of-the-art facility for the Emcore JV in Tampa, Florida (the "Tampa Facility"). According to the 1999 Form 10-K, for the fiscal year ended September 26, 1999, the plant

> was substantially completed during Fiscal 1999 at a cost of approximately $11 million. Additional machinery and equipment of approximately $10 million was purchased during fiscal 1999.

32.    As reported in Uniroyal's Current Report on Form 8-K, dated April 27, 2000, the Emcore JV entered into a supply agreement with Emcore (the "Supply Agreement"), whereby Emcore agreed to supply epitaxial wafers, dies, and package ready devices to the joint venture until the joint venture was ready to produce its own HB-LED products. These materials are all building blocks in the production of HB-LEDs.

33.    The first step in producing an LED is the production of a substrate wafer. Initially, the Emcore JV would purchase blank two-inch wafers consisting of substrate sapphires

11

from an outside vendor.  These wafers were grown, sliced, thinned, and polished by Uniroyal's vendors to Uniroyal's specific requirements.  The goal is to manufacture electronic circuitry on these sapphire wafers.  To achieve this, the wafers are placed in reactors where they are sprayed with a chemical compound.  From there, the wafers are sent into the fabrication line, where, through a process involving a template, circuitry is laid on the wafer in either gold or aluminum. A second layer of circuitry is then laid with another template.  Those templates are then pulled off leaving only the circuitry on the wafer.  The circuitry is then tested and, if it passes the test, it is sent to a machine where it is chopped up and sorted into thousands of small chips called dies. The dies are then encapsulated with different lenses, yielding the finished HB-LED product.

**The Emcore JV Began To Experience Problems**
**From Its Inception**

34.     As part of the Emcore JV, according to former Emcore and Uniroyal employees employed during the Class Period and involved with the Optoelectronics & Semiconductor Division, Emcore was to supply the reactors that were to be used to "grow" HB-LEDs.  The reactors were to be jointly owned by Emcore and Uniroyal.  There were six reactors; each was built to grow a different color LED.  The cost of the reactors ranged from $1.5 million to $2.5 million depending on the size of the reactor.   Each reactor was designed to be modifiable to enable the joint venture to produce varied sizes of LEDs.  According to a former manufacturing supervisor for UOE employed during the Class Period, because the technology in the semiconductor field was dramatically changing on a weekly and monthly basis, it was essential that the reactors were modifiable. Any delay in production would cost Uniroyal money because the customers would then switch to another LED supplier.  This was a significant problem because, according to Uniroyal's SEC filings,  there were at least seven other competitors producing LEDs and related products.

12

35.     Former employees of both Uniroyal and Emcore have said that there were significant problems getting the reactors to work. According to Wayne Parades, a former Manufacturing Engineer for UOE responsible for testing various LED related products from August, 1999 to January, 2002, the joint venture was plagued by production and quality problems from its initial start-up. The reactors were constantly malfunctioning and producing an inconsistent product. Parades could not recall a time when all the reactors were operating at the same time.

36.     In fact, according to former Emcore and Uniroyal employees employed during the Class Period, the reactor that was to produce red LEDs never worked properly. According to Parades, when the Emcore JV was finally able to get this reactor to function, all it was able to produce was amber and yellow light. Significantly, according to material posted on Uniroyal's web-site, the red LEDs accounted for a huge segment of the LED market. Parades further explained that the red LEDs were a very "hot item" in the marketplace.

37.     These manufacturing problems placed a serious strain on the relationship between the Emcore and Uniroyal employees. Each joint venture partner accused the other of not performing as agreed. According to Parades, the relationship continued to deteriorate during the life of the Emcore JV.

**The Emcore JV Continued To Experience Problems
Throughout The Class Period**

38.     The Emcore JV continued to have material problems with the reactors throughout the Class Period. Consequently, according to Parades, Uniroyal was unable to mass produce any saleable product on a commercial scale. Specifically, at the peak of production, the Emcore JV was producing one to two million dies a month. According to Parades, the joint venture would have needed to produce several million dies per month just to meet costs.

13

39.     Products supplied by Emcore under the Supply Agreement accounted for virtually all of Uniroyal's sales.  According to Michael Hanson, the former Production Planning Manager for UOE  from December 2000 to January 2002, the few LEDs that were eventually produced by the Emcore JV were not saleable.  Given all the problems the Emcore JV experienced with getting the reactors operational, some LEDs were simply not up to par.  According to Parades, the product produced by the Emcore JV were often inconsistent in size and specifications, and in some instances, they did not work at all.

40.     In fact, according to Parades, the Emcore JV could not even get GELCore, a joint venture between Emcore and GE Lighting, a unit of General Electric Corp., to buy the HB-LEDs. According to Parades, there were several attempts during 2001 to sell product produced by the Emcore JV to GELcore, but after performing an analysis of the product, GELcore refused to purchase the product because of its defects.  According to Parades, Defendants were intimately involved with these failed attempts to sell product to GELcore.  According to a December 28, 1999 Sarasota Herald Tribune article, Defendants had initially expected to sell their product to GELcore.  At the time, Zulanas referred to GELcore as Uniroyal's "own inside sales track for a good portion of its production."  Despite this "inside track," Uniroyal still could not get GELcore to accept their substandard product.

41.     According to Hanson, any product that was not defective was produced so long after it was to have been made, that it was outdated and no longer marketable.  Between the defective product and the outdated product, according to Hanson, approximately 90% of Uniroyal's inventory was unsaleable.

42.     After a number of disputes arose between the parties, according to a former UOE Manufacturing Supervisor employed during the Class Period, Emcore sought to exercise its

14

option to be bought out of the joint venture. The Emcore JV was unwound in August 2001 on terms that permitted Uniroyal to retain all the business of the joint venture. Uniroyal, however, was left without a partner to pursue the joint venture objectives and share its funding requirements.

**Defendants Knew Of And Concealed The Emcore JV's Failings**

43.     According to Parades, the Defendants, who visited the Tampa facility regularly, were well aware of the problems affecting the Emcore JV. Specifically, when Defendant Zulanas was the acting General Manager of the facility, he visited the facility at least once a week. Defendant Curd visited the Tampa facility at lease once a week and Defendant Soran was present at the facility on average of three days a week. Furthermore, according to Uniroyal's own submissions in the bankruptcy proceeding, Soran was intimately involved in the day-to-day operations of the Emcore JV.

44.     In addition, according to Parades, the reactor problems were documented in daily production reports that listed which reactors were actually working and how many wafers they were producing. Specifically, engineers from each area kept a daily log and records of, among other things, what was produced during the day and which systems were experiencing problems. For example, in June or July 2001, Parades remembered the reports indicating that none of the reactors were working and that the tool needed to cut the wafers into dies had broken down. Each engineer then produced an individual area report. These reports were then summarized by the individual area managers at weekly production meetings. One or more of the named defendants were almost always present at these weekly production meetings.

45.     Furthermore, the Emcore JV was equipped with an on-line electronic database system that tracked all aspects of production. According to Parades, the database used the

CAMSTAR software system. According to the Company's web-site, "[t]his quality management foundation is based upon achievement of [ISO standards] and is used by the company to foster product consistency and as a baseline for benchmarking performance." The Company touted this "electronic Quality Management System" as the "basis of the strength of our company's activities and product success." Specifically, the system was set up to help the Company meet ISO-9000 standards, a series of international standards for quality management systems. According to Parades, the Intellectual Technology Division, headed by Defendant Soran's son, Rick Soran, was responsible for the system. The system contained "every detail" about the Emcore JV's production and all the managers as well as each Defendant had constant access to the system.

46.     Accordingly, not only did Defendants see for themselves that the reactors did not work, they received numerous reports evidencing the Emcore JV's failure to mass produce a commercially saleable product. Determined to conceal this information from the market, according to Hanson, Uniroyal management directed Hanson and others to put the unsaleable LEDs on the shelf and classify them on Uniroyal books as good inventory of finished goods even though approximately 90% of them would not function.

47.     According to Parades, Defendants were also aware that senior UOE management felt that Defendants' production projections for the Emcore JV were unreasonable. Specifically, at a mandatory company-wide meeting for all employees of the Optoelectronics segment held on October 19, 2001 in Tampa, Dr. David Miller, General Manager of the segment, told all those present, including Defendant Zulanas, that against his better judgment, he had "been coerced by George Zulanas" to change the projections by the facility to a level higher than he would have otherwise said.

16

48.     Once the JV unwound in August 2001, Uniroyal failed to receive $21 million in cash from its joint venture partner.  As Uniroyal admits in its bankruptcy filings, because this funding requirement, as well as others, was already incurred or committed, Uniroyal was soon to face a liquidity crisis.  In fact, Uniroyal knew this months before the dissolution of the Emcore JV.  According to testimony by Defendant Curd at a bankruptcy hearing, "in the early part of [2001], we were informed by the joint venture partner that they were no longer going to continue funding our joint venture operation."  Despite this knowledge, Uniroyal continued to tout the future prospects of the Division.

49.     Uniroyal's need for cash became so desperate that, according to testimony given in the bankruptcy proceeding by Thomas Lauria, an attorney whose firm had represented Emcore in various dealings with Uniroyal, Emcore considered loaning Uniroyal  money in early 2002.  Uniroyal failed to disclose any of this information to the market.

**B. The Sterling Acquisition**

50.     Another key vehicle for Uniroyal's high-tech transition was its acquisition of Sterling.  Sterling grew silicon carbide ingot crystals.  Those crystals were then cut into wafer-thin discs on which Sterling hoped to grow circuits.  If successful, according to Hanson, Sterling and Uniroyal believed that these would be the fastest semiconductors in the world and could be used in a variety of applications in optoelectronics, high temperature and high power electronics, and wireless communications.

51.     Uniroyal acquired Sterling for approximately 1,533,000 shares of Uniroyal common stock.  At the time the Sterling shareholders voted to approve the merger with Sterling, Uniroyal common stock closed at $18 per share.

52.    Among Uniroyal's stated reasons for recommending the Sterling acquisition, as set forth by Uniroyal in the Confidential Private Placement Memorandum and Proxy Statement dated April 28, 2000, was "the prospect of utilization of Sterling's business, research and technological experience in the semiconductor field as a platform for further growth in the semiconductor markets served by Sterling."

**Uniroyal Falsely Portrayed Sterling's Value To The Market**

53.    Uniroyal portrayed Sterling to the market as its passport into the high tech market of silicon carbide semiconductor products and devices.  As noted above, Uniroyal believed that, among other things, its acquisition of Sterling would help the Company further expand its optoelectronics applications.   According to an April 18, 2000 press release announcing the acquisition, Uniroyal explained that:

> We are strategically positioned to increase Uniroyal's participation in the explosive compound semiconductor industry via internal growth as well as through acquisition. The addition of the silicon carbide technology developed by Sterling creates a variety of opportunities for expansion into devices that solve common problems in the high frequency communications, high temperature, high power and optoelectronics applications.

54.    In fact, however, neither Sterling nor Uniroyal had the resources to develop such high-tech devices.  According to a former Sterling Senior Polishing Technician who worked at Sterling before and after the acquisition, Sterling had been operating at a loss, would probably continue to generate losses, and was always short of operational financing.  Indeed, according to this former employee, Sterling was "about two weeks away from bankruptcy" had Uniroyal not purchased Sterling.

55.    Uniroyal was aware of the true condition of Sterling.  According to the same former Sterling senior executive, Uniroyal spent weeks conducting due diligence prior to the

18

acquisition. Moreover, Uniroyal made a bridge loan to Sterling before the acquisition. Furthermore, at the time of the acquisition, Sterling had negative working capital, a factor that caused PricewaterhouseCoopers LLP ("PWC") to question Sterling's on-going viability. According to a PWC opinion dated April 4, 2000: "the Company is an early stage technology company that has experienced losses from operations since inception, and has negative working capital and an accumulated deficit, which collectively raise substantial doubt about the Company's ability to continue an [sic] going concern." [Emphasis added.]

56.     In order for Sterling to develop and produce the silicon carbide devices that Uniroyal was promising the market, Uniroyal would have to infuse Sterling with enormous amounts of capital to support its continued R&D efforts. Ultimately, according to Hanson, because Uniroyal had neither the unlimited capital necessary to fund such ground-breaking research nor the technical expertise to assist in the development of these products, Uniroyal's purchase of Sterling was "ridiculous."

**Sterling Failed To Ever Produce The Promised Products**

57.     According to Hanson, Sterling "never even got close" to growing circuitry on its silicone carbide wafers. The Sterling technicians did not even know how to properly operate the equipment used to grow the circuitry. In fact, on two separate occasions during the Class Period, Sterling personnel blew up the machinery used for the growing process. According to Hanson, the machinery was first blown up at approximately the end of October or the beginning of November of 2001. Vendors were then brought in to recondition the machinery. Shortly after the machinery was operational, Sterling personnel blew it up again just before Christmas in December 2001. As a result, according to Hanson, "Sterling never produced a product which could be sold, and was nothing more than a cash drain on Uniroyal."

19

58.     Defendants were aware of Sterling's manufacturing difficulties.  As they admit in their filings with the bankruptcy court, they were intimately involved in the day-to-day operations of Uniroyal and its subsidiaries.  Furthermore, according to Hanson, Defendants came to visit the facility following each episode to assess the damages caused by the blown-up machinery.  By the second time, in December 2001, Defendants recognized that the current Sterling personnel were incapable of running the machinery and brought in a team of German scientists to oversee the process. According to Hanson, there were also numerous telephone calls during the same time period between Defendants and Gene Lewis, the president of Sterling, regarding Sterling's continuing problems.

## MISSTATEMENTS AND OMISSIONS DURING
## THE CLASS PERIOD

59.     Throughout the Class Period, Defendants provided a steady stream of pronouncements regarding the then-existing manufacturing capabilities and prospects of Uniroyal's Optoelectronics and Semiconductor Division.  Among other things, they conditioned the market to believe that the Emcore JV was proceeding as planned and that they were producing commercially saleable HB-LEDs.  They also lead that market to believe that Sterling was a valuable asset and the acquisition would be Uniroyal's entry into the lucrative semiconductor market.  Defendants' statements, however, were false and misleading because they failed to disclose, among others, the following material adverse facts that were known to Defendants or recklessly disregarded by them:

(a)     the Emcore JV was experiencing serious manufacturing difficulties;

(b)     most of the product that was "produced" by the Emcore JV was in fact supplied to the Emcore JV by Emcore;

(c)     what little product that was produced by the Emcore JV that was not supplied by Emcore was not commercially saleable;

(d)     Uniroyal was forced to buy out Emcore's interest in the JV;

(e)     Emcore informed Uniroyal in the early part of 2001 that they were no longer going to continue funding the joint venture;

(f)     once the Emcore JV was dissolved, Uniroyal lost "the primary provider of the equipment and research and development expertise" and  Uniroyal was left without a partner to pursue the joint venture objectives and share its funding requirements. Specifically, it failed to receive $21 million in cash from Emcore, a funding requirement that had been already incurred;

(g)     Uniroyal was in such desperate need for money by the beginning of 2002, that it sought a loan from Emcore;

(h)     Sterling was teetering on the edge of bankruptcy before Uniroyal purchased it;

(i)     in April, 2000, before the Sterling acquisition, PWC  issued an opinion questioning whether Sterling could continue as a going concern;

(j)     Uniroyal had lent Sterling over $2 million before it had even closed the acquisition;

(k)     Uniroyal had neither the unlimited capital nor the technical expertise necessary to help Sterling develop devices based on its silicon carbide wafers; and

(l)     Sterling was having no success trying to develop devices based on its silicon carbide wafers, had actually twice blown up the machinery used in the development process, and had brought in a new team of German scientists because they felt Sterling's personnel were incompetent.

## SUBSTANTIVE ALLEGATIONS

60.    On February 8, 2000, the Company announced its financial results for the first

fiscal quarter ended January 2, 2000.  In the press release, Uniroyal reported net income of

$2,420,000, or $0.18 per diluted common share, versus net income of $19,000, and a break even

per diluted common share for the same period in the prior year.  Sales for the first quarter were

reported to be $48.9 million, versus $49.1 million in the prior year.  Sales from continuing

operations, excluding sales of the Coated Fabrics automotive business from both periods,

purportedly increased 13% for the first quarter.  With regard to the Optoelectronics Division, the

segment reported sales of $614,000 in the first quarter and a loss before interest and taxes of

$2,929,000, reflecting "continued start-up costs related to the segment's ramp-up of production of

high brightness light emitting diodes."

61.    Commenting on the reported results, Defendant Curd stated:

> We continue to aggressively spend in our Optoelectronics segment
> and we continue to reach key production milestones.  We are
> greatly encouraged by the industry interest in our optoelectronics
> products and the significant interest we are getting in our Company
> from the investment community.

62.    On February 9, 2000, the St. Petersburgh Times carried an article discussing the

Company's reported financial results and the purported success that it had with regard to the

production of LED products, as well as recognition from Wall Street about the Company's

visibility:

> After months of testing, Uniroyal 's $35-million Tampa plant is
> producing light-emitting diodes, or LEDs, an alternative type of
> lighting. The company is building its inventory and plans to start
> shipping products in the next few weeks.
>                        * * *
> This week, the offshoot of the tire manufacturer got some more
> good news. Wit Soundview, a Stamford, Conn., research firm,

22

initiated coverage with a "strong buy" rating and a target stock
price of $55 in the next year.
                                   * * *
Wit Soundview projects that Uniroyal will sell $14-million worth
of LEDs this year and $44-million worth next year, and <u>Uniroyal
execs say they're comfortable with those projections.</u> [Emphasis
added.]

63.     On February 11, 2000, Defendants caused the Company to file with the SEC its

quarterly report on Form 10-Q for the fiscal quarter ended January 2, 2000 (the "First Quarter

2000 Form 10-Q"). The First Quarter 2000 Form 10-Q, which was signed by Defendant Zulanas,

contained substantially similar financial data as the February 8, 2000 press release.

64.     Uniroyal's stock price reflected enthusiasm for the Company's reported financial

results and its prospects for the production of LED products. On February 9, 2000, Uniroyal

stock climbed to over $71 per share and reached more in the days that followed.

65.     The February 8, 2000 press release and the First Quarter 2000 Form 10-Q were

materially false and misleading because each reported materially inflated net income for the

following reasons:

(a)     On June 10, 1996, the Company sold substantially all the assets net of

certain liabilities of its Ensolite closed cell foam division to Rubatex Corporation ("Rubatex")

for $25,000,000. Proceeds from the sale consisted of $20 million in cash and a $5 million

unsecured promissory note receivable (the "Note") from RBX Group, Inc. ("RBX"), the parent of

Rubatex. Interest on the Note was payable semi-annually at 11.75% per annum. The Note was

to mature on May 1, 2006. In January 1998, the Company sued RBX to compel the latter to

honor a mandatory early redemption obligation under the terms of the Note. Defendants failed

to disclose in the First Quarter 2000 Form 10-Q (in violation of FASB Statement No. 5 and APB

Opinion No. 28) through the disclosure of the loss contingency and a charge to earnings that the

23

Note and accrued interest were uncollectible. Defendants knew, but failed to disclose that RBX

had been financially crippled by a sustained strike since September 1999, and was facing

imminent bankruptcy. Consequently, RBX did not have the funds to pay Uniroyal, even if

Rubatex had not counterclaimed (as it had for breach of warranty). As a consequence, the

Company's first quarter financial statements falsely reflected $2,420,000 in net income instead of

a net loss.

        (b)     the Company had either loaned or committed to loan more than $2 million

to Sterling, a development stage company that had sustained losses throughout its existence and

was facing imminent bankruptcy.

        (c)     though the Company may have reached certain milestones with regard to

the production of LEDs, Defendants falsely led investors to believe that Uniroyal was positioned

to commence the mass production of LED products for commercial sale. As alleged above in

paragraphs 34-49, above, Defendants knew, but failed to disclose, that (a) the Emcore JV was

experiencing serious manufacturing difficulties; (b) most of the product that was "produced" by

the Emcore JV was in fact supplied to the joint venture by Emcore; and (c) what little product

produced by the Emcore JV, not supplied by Emcore, was not commercially saleable on a mass

scale.

      66.     The statements in the St. Petersburg Times concerning the sale of LEDs were

materially false and misleading. Defendants' reported comfort with Soundview's projections for

the sale of LEDS in 2000 and 2001 lacked any reasonable basis in fact. Defendants knew or

recklessly disregarded that, as alleged in paragraphs 34-49, above: (a) the Emcore JV was

experiencing serious manufacturing difficulties; (b) most of the product that was "produced" by

the Emcore JV was in fact supplied to the joint venture by Emcore; and (c) what little product

produced by the Emcore JV, not supplied by Emcore, was not commercially saleable on a mass scale.

67.     On February 29, 2000, the Company issued a press release entitled "Uniroyal Technology Corporation to Use Proceeds From Sale of Segment to Pay Down Debt and Expand Technology Presence." In the press release, the Company announced that it planned to use the proceeds from the sale of its High Performance Plastics segment to pay down debt, expand its capacities for the production of HB-LEDs, and explore strategic acquisitions in the high technology area. Commenting on the "accelerated" pace with which the Company was expanding its production capacity, Curd stated "We are increasing the capacity for HB-LEDs as fast as possible. The market is strong and our objective is to be a major player in this industry." In that regard, the Company stated that it "recently began shipping HB-LEDs to a major customer."

68.     Defendants' statements regarding Uniroyal's production and shipment of HB-LEDs were materially misleading because they falsely led investors to believe that Uniroyal would be a strong participant in the LED market and was selling its product to a "major customer." Defendants knew, however, that they had no basis to indicate that Uniroyal would be a "major player in th[e] industry" given the problems that Uniroyal (and more specifically, the Optoelectronics segment) was facing with the manufacture of HB-LEDs. The statements were similarly misleading because they conveyed the impression that the JV was capable of producing HB-LEDs of saleable quality in commercial quantity when in fact, as discussed supra at 29-42, Uniroyal was experiencing serious manufacturing and production difficulties. Moreover, Defendants knew or recklessly disregarded that most of the product being sold to the unidentified customer was, in fact, manufactured by Emcore, not the Emcore JV. Consequently, Defendants

falsely led investors to believe that Uniroyal was producing a product for commercial sale, when, in fact, the majority of the product were manufactured by its joint venture partner.

69.    On March 10, 2000, the Company announced that the Board of Directors had authorized a two-for-one stock split. In the press release, Defendants reiterated that the Company "recently began shipping high brightness light emitting diodes (HB-LEDs) produced at its state-of-the-art 77,000 square foot manufacturing facility."

70.    The statement regarding Uniroyal's production and shipment of HB-LEDs was materially false and misleading for the reasons described with regard to the February 29th press release. As alleged above, Defendants failed to disclose the problems Uniroyal was facing with the manufacture of HB-LEDs; specifically, that most of the HB-LEDs that were being shipped were not produced by Uniroyal, but were supplied by Emcore. The statements were similarly misleading because they falsely conveyed the impression that the Emcore JV was capable of producing HB-LEDs of saleable quality in commercial quantity when in fact, as discussed supra at 29-42, Uniroyal could not due to the then-existing manufacturing and production difficulties.

71.    On March 13, 2000, the Company announced that it had promoted two of Uniroyal's "key officers" - Defendant Zulanas and Oliver J. Janney, Vice President, General Counsel and Secretary. Both men were promoted to the office of Executive Vice President. According to the press release, the promotions represented the recognition by the Board of "the significant contributions each has made to coordinate and finalize Uniroyal's successful divestiture of its High Performance Plastics segment as well as their contributions to the start-up of the Company's Uniroyal Optoelectronics business segment in Tampa, Florida."

72.    On April 18, 2000, the Company announced that is was acquiring Sterling, a maker of silicon carbide materials used in semiconductors. The acquisition was to be effected

26

through a merger for approximately 1,469,000 shares of Uniroyal common stock and the

assumption of approximately $4.0 million in long-term debt. Uniroyal also agreed to convert

into Uniroyal stock (approximately 492,000 shares) all "outstanding Sterling stock options held

by key employees."

73.     The transaction gave Uniroyal direct access to one of the materials that could be

used in manufacturing LEDs - silicon carbide - and also opened the door into the lucrative

semiconductor industry. Indeed, the Company touted the latter aspect of the acquisition by

describing Sterling's products as the "next-generation semi-conductor materials," which are "key

to advancing technologies in wireless communications, industrial process controls and

optoelectronics." Commenting on the acquisition, Defendant Curd stated:

> We are very excited about the acquisition of Sterling
> Semiconductor and their excellent management team. We are
> strategically positioned to increase Uniroyal's participation in the
> explosive compound semiconductor industry via internal growth as
> well as through acquisition. The addition of the silicon carbide
> technology developed by Sterling creates a variety of opportunities
> for expansion into devices that solve common problems in the high
> frequency communications, high temperature, high power and
> optoelectronics applications.

74.     The above statements concerning the synergies to be derived from the acquisition

lacked a reasonable basis in fact and, therefore, were materially misleading. As alleged supra at

53-58, Defendants knew that given Sterling's precarious financial condition and its lack of

success creating devices based on its silicon carbide wafers it was improbable that Sterling would

ever become a valuable asset to Uniroyal both in the production of LEDs and in the expansion

into the compound semiconductor industry. Furthermore, Defendants knew, or was reckless in

not knowing, that Uniroyal lacked the technical expertise and the enormous amounts of capital

necessary to support Sterling's expansion. Accordingly, Defendants had no reasonable basis to

27

condition the market to believe that Sterling would help Uniroyal become a player in the

semiconductor industry.

75.     On April 27, 2000, Defendants caused the Company to file with the SEC a current

report on Form 8-K for the purpose of showing Uniroyal's consolidated financial statements for

fiscal years 1997, 1998, and 1999 restated for discontinued operations (i.e., the sale of High

Performance Plastics, Inc. to Spartech Corporation) and the retroactive effect of the two-for-one

stock split declared by the Company on March 10, 2000. Defendant Zulanas signed the Form 8-

K. Among other items in the financial statements was the discussion of the Note from RBX.

76.     As alleged above, the discussion concerning the Note was materially false and

misleading because Defendants failed disclose that RBX had been financially crippled by a

sustained strike since September 1999, and was facing imminent bankruptcy. Consequently,

RBX did not have the funds to pay Uniroyal, even if RBX had not counterclaimed (as it had for

breach of warranty).

77.     On May 17, 2000, the Company announced its financial results for the second

fiscal quarter ended April 2, 2000. In the press release, Uniroyal reported net income (adjusted to

reflect the two-for-one stock dividend) of $60,225,000, or $2.08 per diluted common share,

versus net income in the second quarter of the prior year of $1,059,000, or $0.04 per diluted

common share. The Optoelectronics segment reported an increase in sales to $902,000,

compared to $85,000 in the prior year period. Uniroyal stated that the "segment began shipments

of products from its Tampa, Florida facility during the quarter."

78.     Commenting on the second quarter results, Curd stated:

> We made significant progress at our Optoelectronics segment; we
> announced an agreement to purchase Sterling Semiconductor, Inc.
> (Sterling) which will enable us to compete in wireless and power
> amplification markets; and we completed the sale of a non-

28

strategic business segment which led to a major redeployment of
assets. This sale will allow us to move forward swiftly with major
expansion activities in the high technology arena. We now have a
solid balance sheet with a very strong cash position.

79.     The statements concerning the sale and production of LEDs were materially false

and misleading for the reasons alleged in paragraphs 34-42, 54-58, above. The statements

concerning the Sterling acquisition and the synergies to be derived therefrom were also

materially false and misleading. As alleged above, Defendants lacked a reasonable basis to make

the statements because of, inter alia, the following known, but undisclosed, facts:

(a)     the Company had invested at least $500,000 in Sterling as of April 2,

2000, and by the time of the merger had an investment in Sterling of no less than approximately

$2,640,000;

(b)     but for the Company's financial support, Sterling would have sought

protection under the Bankruptcy laws;

(c)     Sterling had sustained losses throughout its existence and, as of at least

April 2, 2000, had a negative working capital;

(d)     on April 4, 2000, PWC had expressed an opinion on the financial

statements of Sterling, which stated that "the Company is an early stage technology company that

has experienced losses from operations since inception, and has negative working capital and an

accumulated deficit, which collectively raise substantial doubt about the Company's ability to

continue an [sic] going concern";

(e)     Sterling was expected to continue to generate losses;

(f)      Sterling had had no success in its attempts to develop devices; and

(g)     Uniroyal had neither the technical expertise nor the enormous amounts of

capital necessary to support Sterling's attempts to develop devices.

29

80.    Also on May 17, 2000, the Company filed with the SEC its quarterly report on

Form 10-Q for the fiscal quarter ended April 2, 2000 (the "Second Quarter 2000 Form 10-Q").

The Second Quarter 2000 Form 10-Q repeated the financial information set forth in the earnings

release of the same date.  Defendant Zulanas signed the Second Quarter 2000 Form 10-Q.  In

addition to discussing the terms of the Sterling transaction, the Company discussed the purported

accomplishments of its Optoelectronics segment.  In this regard, the Company stated:

> Net sales by the Optoelectronics Segment for the first two quarters
> of Fiscal 2000 were $1,516,000 compared to $85,000 in the first
> two quarters of Fiscal 1999. The Optoelectronics Segment began
> commercial sales and production in the first six months of Fiscal
> 2000 but is still in a start-up mode. [Emphasis added.]

81.    In addition, the Company belatedly disclosed that it had fully reserved the Note

with RBX because of the latter's financial condition and consequent doubtful collectibility of the

monies owed:

> In March of 2000, the Company fully reserved its note receivable
> and related accrued interest from RBX Group, Inc. ("RBX") in the
> amount of $5,387,000.
>
> This was a result of a determination that due to recent events at
> RBX, which include the effects of a prolonged strike at its major
> facility, the financial condition of RBX has deteriorated such that
> collectibility of the note receivable and related accrued interest is
> in doubt.

82.    The statements in the Second Quarter 2000 Form 10-Q concerning the

Optoelectronics Division's production and sale of LEDs were materially false and misleading

because, as alleged in paragraphs 34-49, above, Defendants knew or recklessly disregarded that

the Emcore JV was experiencing serious manufacturing difficulties; product quality was poor

and inconsistent; and most of the product sold was supplied by Emcore not manufactured by the

joint venture.

30

83.    On May 31, 2000, the Company issued a press release announcing that it had

closed the acquisition of Sterling "for approximately 1,533,000 shares of Uniroyal common

stock." Commenting on the acquisition, Defendant Curd stated:

> We are excited to have Sterling as part of Uniroyal. Sterling is a
> perfect fit in our plan for increased participation in the fast-
> growing compound semiconductor industry. For Uniroyal,
> Sterling's technology allows us to broaden the range of products
> we can offer which, in turn, provides an expanded customer base
> for our product lines. And, for Sterling, Uniroyal will provide the
> capital necessary to increase its capacity to meet the needs of its
> customers.

84.    On June 7, 2000, Defendants caused the Company to file a Form S-3 with the

SEC ("June 7, 2000 Registration Statement"). Regarding the Sterling acquisition, the document,

signed by Zulanas, Curd, and Soran, stated the following:

> On May 31, 2000, we acquired Sterling, a Virginia corporation,
> which is a developer and manufacturer of silicon carbide ("SiC")
> semiconductor wafer substrates, related semiconductor devices and
> substrates with epitaxial thin film coatings. In addition to offering
> SiC wafers for sale, Sterling sells a limited product line of epitaxial
> thin film coatings, the active materials used in making functioning
> electronic devices, on SiC wafers.

85.    The above statements concerning Uniroyal's acquisition of Sterling were

materially false and misleading because, among other things, Sterling, a financially unstable

company, had had no success in expanding its technology to create devices. Moreover, Uniroyal

had neither the technical expertise nor the capital to help Sterling accomplish this goal.

Accordingly, Uniroyal had no reasonable basis to tell the market that Sterling could "broaden its

range of products."

86.    On June 8, 2000, in a press release entitled, "Uniroyal Technology Corporation

Optimistic About Asian Market For HB-LEDS Due to Product Performance," William Kennedy,

Director of Sales and Marketing for Uniroyal Technology Corporation's Optoelectronics

31

Division, commented on the oversees market for HB-LEDs. In the press release, Kennedy stated

that "major customers" had validated "the brightness levels achieved by lamps utilizing

[Uniroyal's] HB-LED products" stating that these products "already rival those of established

industry leaders, far outperforming performance levels of existing silicon carbide-based HB-LED

products." The Company also stated that it had "began shipping HB-LED products recently and

continues to ramp-up its production levels."

      87.    Defendants' statements were materially false and misleading because they failed

to disclose that Uniroyal (i.e., the Emcore JV) was facing severe manufacturing difficulties, as

alleged above in paragraphs 34-42. As alleged above, Defendants knew, or recklessly

disregarded, that most of the products manufactured and sold by the Optoelectronics segment at

this time were produced by Emcore, and not Uniroyal.

      88.    On June 14, 2000, the Company filed a current report on Form 8-K with the SEC.

The Form 8-K contained a copy of the April 10, 2000 Merger Agreement Among Uniroyal

Technology Corporation, Bayplas4, Inc., and Sterling Semiconductor, Inc. The Merger

Agreement disclosed that:

      (a)    Sterling had negative working capital of $2,541,000 (current assets of

$3,015,000 less current liabilities of $5,556,000 resulting in a negative working capital of

$2,541,000) as of April 2, 2000;

      (b)    for the fiscal year ended September 26, 1999, Sterling reported a negative

gross margin of $934,000 (net sales of $1,948,000 less cost of goods sold of $2,882,000 resulting

in a negative gross margin of $934,000) and a net loss of $2,718,000;

(c)     for the six month period ended April 2, 2000, Sterling reported a gross margin of $75,000 (net sales of $1,654,000 less cost of goods sold $1,579,000 resulting in a gross margin of $75,000) and a net loss of $1,759,000;

(d)     as of April 2, 2000, Sterling had an accumulated deficit of $6,977,000;

(e)     the Company had an "investment in Sterling, which was in the form of a $500,000 bridge loan," that Jesup & Lamont Capital Markets, Inc. would receive a fee from the Company in connection with the transactions contemplated by the merger agreement, and that approximately $406,000 was "to be paid to Jesup & Lamont Securities, a related party." It also stated that ". . . in the event that the Closing has not occurred by June 15, 2000 . . . Uniroyal will lend Sterling the sum of two million five hundred thousand dollars ($2,500,000) for working capital . . . ."

89.     However, the Merger Agreement failed disclose, at least, the following known facts:

(a)     but for the Company's financial support, Sterling would have been forced to seek protection under the bankruptcy laws;

(b)     Defendants had paid an inflated price for Sterling with materially overvalued stock serving as currency, in order to materially inflate the net worth of the Company in violation of GAAP (APB Opinion No. 16);

(c)     the Company had invested no less than $2,640,000 in Sterling as of the date of the acquisition; and

(d)     PWC had given Sterling a "going concern" tag in an April 4, 2000 opinion letter.

33

90.    On July 13, 2000, the Company filed a Form S-3/A with the SEC, amending the June 7, 2000 Registration Statement.  This document, which was signed by Defendants Zulanas and Curd, repeated the statements contained in the June 7, 2000 Registration Statement, and therefore, is materially false and misleading for the reasons alleged in paragraph 85 above.

91.    On August 15, 2000, the Company filed with the SEC an amended current report on Form 8-K/A.  The amended filing, signed by Defendant Zulanas, revealed much about Sterling's weak financial condition:

(a)    as of December 31, 1999, Sterling had a $2,339,505 negative working capital (current assets of $1,532,005 less current liabilities of $3,871,510 resulting in a negative working capital of $2,339,505);

(b)    as of March 31, 2000, Sterling had a $2,540,411 negative working capital (current assets of $3,015,430 less current liabilities of $5,555,841 resulting in a negative working capital of $2,540,411);

(c)    for the three months ended March 31, 1999, Sterling reported a net loss of $595,181;

(d)    for the three months ended March 31, 2000, Sterling reported a net loss of $874,671;

(e)    Sterling had "incurred net losses since its inception and had negative working capital of approximately $2,340,000 and an accumulated deficit of approximately $4,942,000 at December 31, 1999"; and

(f)    there was (according to PWC's April 4, 2000 opinion letter) "substantial doubt . . . regarding the Company's ability to continue an [sic] going concern."

34

92.    On August 16, 2000, the Company announced its financial results for the third

fiscal quarter of 2000.  For the quarter, Uniroyal reported a net loss from continuing operation,

excluding goodwill amortization of $0.05 per diluted share.  Including goodwill amortization, the

net loss per diluted share from continuing operations was reported to be $0.07.  Regarding the

Compound Semiconductor and Optoelectronics Division, Uniroyal reported sales of $304,000,

an increase from the $253,000 reported in the third quarter of the preceding year.

93.    Commenting on the results, Defendant Curd stated:

> **We've made significant progress during this past quarter in
> positioning the Company to be a premier participant in the fast
> growing optoelectronics and silicon carbide industries.** We've
> added highly respected research scientists and reactor capacity for
> our Optoelectronics business and we are quickly expanding the
> capabilities of Sterling for the production of silicon carbide wafers
> and epitaxy. [. . . .] We continue to invest heavily in the short-term
> for long-term success. [Emphasis added.]

94.    The financial statements in the August 16th earnings release regarding sales for the

Compound Semiconductor and Optoelectronics Division were materially false and misleading.

As alleged above in paragraphs 34-49, 57-58, Defendants knew or recklessly disregarded that the

segment - primarily the Emcore JV - was experiencing material difficulties manufacturing

products that met quality control standards or satisfied customer specifications.  Defendants also

knew that the Emcore JV could not manufacture any products in sufficient commercial quantity

to support the sales figures reported in the press release.  Consequently, Defendants knew that the

bulk of the sales referenced in the earnings release were derived from products supplied by

Emcore only.  Further, Curd's statement about reactor capacity was materially false and

misleading.  As alleged in paragraph 35 above, Uniroyal experienced significant problems

getting the reactors to work, individually and at the same time.

35

95.     On August 16, 2000, Defendants caused the Company to file with the SEC its

quarterly report on Form 10-Q for the third fiscal quarter ended July 2, 2000 (the "Third Quarter

2000 Form 10-Q"). Defendant Zulanas signed the Third Quarter 2000 Form 10-Q. In the

discussion concerning the Sterling acquisition, the Company stated: "The acquisition costs for

Sterling primarily include approximately $428,000 paid to an investment banking firm that

employs relatives of one of the Company's executive officers and approximately $128,000 paid

to a law firm of which one of the Company's directors is a senior partner." In addition, it set

forth the following information with regard to the acquisition of Sterling (in thousands):

| | |
|---|---:|
| Working capital | $ (403) |
| Property, plant and equipment | 1,840 |
| Deferred tax asset | 3,955 |
| Other assets | 1,251 |
| Goodwill | 37,749 |
| Notes payable | (1,051) |
| Other liabilities | (2,639) |
| Net value of purchased assets | 40,702 |
| Value of common stock and employee stock options issued | (40,614) |
| Cash paid for fractional shares | (2) |
| Accrued acquisition costs | (699) |
| Cash acquired at acquisition | $ (613) |

96.     The Third Quarter 2000 Form 10-Q was materially false and misleading for the

reasons alleged infra.

97.     On August 30, 2000, Jesup & Lamont issued an analyst's report that stated: "We

are initiating coverage with a BUY recommendation on Uniroyal Technology." From this date

until the end of the Class Period, Jesup & Lamont touted the Company's stock with a "Buy"

recommendation, issued positive statements and released earnings projections without any

reasonable basis.

98.     Jesup & Lamont has been in business since 1877.  On Jesup & Lamont's web site, the firm describes itself as having an established "reputation in institutional trading and research" and "serves as investment broker for institutions and high net-worth individuals and as an investment banker and merchant banker for entrepreneurial public and private small-and mid-sized companies."  Accordingly, the investment reports Jesup & Lamont issued that expressed a "Buy" recommendation, contained positive statements about the Company, had the effect of bolstering the market price of Uniroyal's securities.

99.     In Uniroyal's SEC filings, the Company discloses that it "has an agreement with an investment banking firm that employs relatives of one of the Company's executive officers."  The relationship referred to is with Jesup & Lamont.  As disclosed on the Jesup & Lamont web site:

> Howard [F.] Curd is Vice Chairman of Jesup & Lamont, Head of Capital Markets and Member of the Management Committee. . . . Howard began his career at Jesup & Lamont in 1986 as a member of the Investment Banking Group where he focused on leveraged buyouts, mergers and acquisitions and high yield finance.  In 1991, he assumed the position of President and Chief Executive Officer. . . . He also founded Jesup & Lamont Merchant Partners which purchased a majority interest in Emcore Corporation, a semi conductor equipment company that went public in 1997. . . . He is a director of Hemagen Diagnostics Corporation and a former director of Emcore Corporation and Uniroyal Technology Corporation.

100.    During the Class Period, Howard F. Curd's father, Defendant Curd, was Chairman and Chief Executive Officer of Uniroyal.

101.    As noted in the Company's July 1, 2001 Form 10-Q (filed with the SEC on August 15, 2001):

> On May 22, 2001, the Company announced the election of Howard F. Curd to its Board of Directors.  Mr. Curd is President and Chief Executive Officer of Jesup & Lamont Group Holdings, Inc., a

37

diversified financial holding company, and the son of Howard R.
Curd, Chairman and Chief Executive Officer of the Company.

Accordingly, from August 30th throughout the Class Period, Jesup & Lamont acted a conduit for

the materially false and misleading information issued by the Defendants. Thus, at the time

Jesup & Lamont issued its "Buy" rating for Uniroyal stock, it did so on the basis of materially

false and misleading information provided by Defendants.

102.    On December 7, 2000, the Company announced its financial results for the fourth

fiscal quarter of 2000. For the quarter, the Company reported the following with regard to the

Optoelectronics Division:

> Sales for the Compound Semiconductor and Optoelectronic
> segment grew 296% sequentially, increasing to $1.2 million in the
> fourth quarter from sales of $304,000 in the third quarter of FY
> 2000. Last year sales for the fourth quarter were $147,000.
> Sterling Semiconductor, Inc. ("Sterling"), which was acquired on
> May 31, 2000, was consolidated for three months in the fourth
> quarter versus only one month in the third quarter of FY 2000.

103.    The reported sales figures for the Optoelectronics segment were materially

misleading because Defendants failed to disclose that the manufacturing difficulties facing the

segment were such that it was incapable of production at commercial levels. Moreover,

Defendants failed to disclose that the bulk of the reported sales were attributable to product

supplied by Emcore, not the Emcore JV - a component of the Optoelectronics Division.

104.    On December 13, 2000, the Company filed with the SEC its annual report on

Form 10-K for the fiscal year ended October 1, 2000 (the "2000 Form 10-K"). Defendants

Zulanas, Soran, and Curd signed the 2000 Form 10-K. In the 2000 Form 10-K, Defendants

stated:

> As of December 31, 1999 (prior to the acquisition of Sterling by
> us), Sterling's accumulated deficit was approximately $4.9 million.
> It incurred losses of approximately $3.1 million in calendar year

38

1999 (Sterling's fiscal year was a calendar year end prior to its acquisition by Uniroyal). Since its acquisition by us, Sterling has incurred losses of $788,000 prior to intangible and goodwill amortization and the recognition of acquired in-process research and development. We expect Sterling to continue to incur losses.

105.   Discussing Sterling, the 2000 Form 10-K further stated:

Included in other liabilities [of Sterling] as of the acquisition date is approximately $2,640,000 related to the Company's investment in Sterling prior to the merger. Subsequent to the merger, this amount was converted to a capital contribution.

The excess of the purchase price over the fair value of the net identifiable assets, totaling $28,415,000 was allocated to goodwill and is being amortized on a straight-line basis over 5 years.

106.   In the 2000 Form 10-K, Defendants touted the Tampa Facility: "We lease a state-of-the-art 77,000 square foot plant in Tampa, Florida for manufacturing epitaxial wafers and package-ready dies for use in HB-LEDs. ...We doubled the production capacity for HB-LEDs in blue and green colors at a cost of approximately $4.0 million."

107.   The above statement regarding the Tampa Facility  was materially false and misleading because Defendants failed to disclose the difficulties Uniroyal was having with production at the Tampa Facility.  For example, according to Parades, the reactors used to manufacture the HB-LEDs were constantly malfunctioning and produced an inconsistent product. Accordingly, describing the capacity as "doubled," when the Facility was still incapable of obtaining commercial production levels, was materially false and misleading.

108.   The 2000 Form 10-K was also materially false and misleading because, as discussed infra,  the financial statements contained therein failed to recognize, through  a charge to earnings, the worthlessness of the goodwill and intangible assets (such as "existing product line, core technology and trained workforce") that had been recognized upon the acquisition of Sterling in compliance with FASB Statement No. 121.

39

109.   In the Letter to Shareholders attached to Uniroyal's 2000 Annual Report to

Shareholders, Defendants Curd and Soran touted Sterling's potential and the production

capabilities of the Tampa Facility:

> We believe that, within a short period of time, Sterling will
> become a worldwide leader in the production of SiC
> devices.
>
> * * *
>
> At our Optoelectronics facility in Tampa, we doubled our
> epitaxy capacity for the high brightness LEDs in the blue
> and green colors during Fiscal 2000 and added state-of-the-
> art "pick and place" equipment that will allow us to deliver
> products to customers' exacting specifications.

110.   Defendants had no reasonable basis to support the statements regarding

Sterling.  As set forth in detail at paragraphs 57-58, Sterling had had no success in its attempts at

to produce  SiC devices.  In fact, they had twice blown up the machinery used in the process.

Furthermore, Uniroyal had neither the technical expertise nor the enormous amounts of capital to

support Sterling's efforts.  Similarly, the statements regarding the Tampa facility were materially

false and misleading.  As discussed above, the equipment Uniroyal purchased was not working

so it could not have "doubled its capacity" or allowed them to "deliver products to customer's

exacting specifications."

111.   In April 2001, the Company issued a series of press releases concerning its ability

to manufacture LED products.  On April 5, 2001, the Company announced that it had begun

distribution of two high brightness blue LED products.  Commenting on the announcement,

Soran stated:

> Uniroyal Optoelectronics is producing increasingly higher quality
> products from its Tampa facility, and we are excited by the
> progress of our Optoelectronics team. In less than two years since
> the completion of the clean rooms in our facility, we have

40

developed LED products with brightness levels reaching or
exceeding the products currently on the market.

112.   Soran's statements concerning the purported increase in quality of products was

materially misleading.  As alleged above in paragraphs 34-49, Soran knew or recklessly

disregarded that the product quality was a persistent problem with the devices manufactured by

the Emcore JV.  These problems had not been corrected sufficient to support Soran's statement.

113.   On April 10, 2001, the Company announced that its high brightness blue LEDs

were exhibiting the highest brightness levels achieved by any LED manufacturer.  In the press

release entitled "Uniroyal Technology Corporation's Optoelectronics Segment Demonstrates

Highest Brightness Levels in Industry," Soran stated:

> The Optoelectronics team has done an outstanding job of rapidly
> ramping up production of exceptional products to meet our
> strategic plan. ... The addition of the R&D group has been
> instrumental to product advancements made over the last several
> months.  The brightness levels we are currently demonstrating
> provide Uniroyal the opportunity to be the leader in the high
> brightness LED market.

114.   Soran's statements concerning the production of LED products were materially

false and misleading because he knew or recklessly disregarded that Uniroyal was incapable of

commercial production of the HB-LEDs.  As noted by Hanson and Parades in paragraphs 34-42

above, Uniroyal was plagued with production problems such that most of the product

manufactured was of poor quality and not of commercial quality.

115.   On May 9, 2001, Defendants caused the Company to file with the SEC its

quarterly report on Form 10-Q for the quarter ended April 1, 2001 (the "Second Quarter 2001

Form 10-Q").  Defendant Zulanas signed the Second Quarter 2001 Form 10-Q.  The Second

Quarter 2001 Form 10-Q was materially false and misleading because as alleged infra, the

financial statements contained therein failed to recognize, through a charge to earnings, the

41

worthlessness of the goodwill and intangible assets (such as "existing product line, core technology and trained workforce") that had been recognized upon the acquisition of Sterling in compliance with FASB Statement No. 121.

116.   Also on May 9, 2001, Uniroyal issued a press release in which it discussed statements made by Defendant Soran to analysts during the Company's second quarter conference call. In the release, the Company stated that Soran had told the analysts that the Optoelectronics segment had achieved exceptional brightness levels with its high brightness red light emitting diode (HB-LED) products.

117.   Soran's statements to analysts as reflected in the press release were materially false and misleading. As alleged in paragraphs 34-35, 43-49 above, Soran knew that the Tampa facility, where the products are purportedly produced, had myriad problems with keeping its reactors on line and operational. Soran also knew that the Optoelectronics Division was then-experiencing severe difficulties with the production of red LEDs. See paragraph 36.

118.   On July 23, 2001, the Company announced that it had signed a letter of intent with Emcore to buy Emcore's minority ownership position in Uniroyal Optoelectronics, LLC. Commenting on the proposed buyout, Curd misleadingly implied that the proposed transaction arose solely as a way to maximize shareholder value by allowing Uniroyal to capitalize on technology that it had developed independent of Emcore:

> This is a unique way to maximize shareholder value for both
> Uniroyal Technology and Emcore. Substantial scientific advances
> recently completed by UOE have resulted in several market leading
> products that show great commercial promise. This will also allow
> our shareholders to realize 100% of the exceptional growth
> anticipated for Uniroyal Optoelectronics.

119.   Though Uniroyal apparently sought to capitalize on its own scientific advances, that was not the sole reason for the dissolution of the joint venture. As alleged above, throughout

42

the Class Period, the manufacturing problems placed a strain on the relationship between Emcore and Uniroyal employees and each partner to the joint venture accused the other of not performing as agreed. Moreover, it was Emcore who chose to exercise its option to force Uniroyal to buy out their interest. As alleged at paragraph 48, Emcore told Uniroyal "in the early part of 2001" that they would no longer fund the joint venture.

120.    Similarly, Uniroyal's characterization of the dissolution as a "way to maximize shareholder value" was false and misleading. Uniroyal failed to disclose the substantial void that could not be immediately filled by the buyout of Emcore's interest. Specifically, as acknowledged in Uniroyal's bankruptcy filings, Emcore was the "primary provider of the equipment and research and development expertise." Moreover, Emcore played a significant financial role in the joint venture–it provided significant sums of money in funding. Without Emcore, Uniroyal was left without a partner to share the extraordinary funding the business required. In that regard, undisclosed to investors, by buying out Emcore, Uniroyal would not receive the $21 million in funding from Emcore that had already been incurred. Indeed, Uniroyal's liquidity crisis was so dire that Uniroyal negotiated a $5 million bridge loan from Emcore at the time of the dissolution of the joint venture. Furthermore, Defendants failed to disclose that without Emcore, the other business components of the Division. namely Sterling, would be adversely impacted, thereby necessitating a review of the Division's business and operations and an impairment analysis of Sterling.

121.    On August 2, 2001, the Company announced that it had completed the purchase of Emcore's minority ownership position in Uniroyal Optoelectronics, LLC by exchanging 1,965,924 shares of Company common stock. Commenting on the acquisition. Defendant Curd stated, "We are very excited about the future of Uniroyal Optoelectronics and the realization of

43

that potential should fully magnify itself as increased shareholder value through UTC's 100%

ownership of this segment. At the same time, we are pleased with the confidence Emcore has

shown in UTC and we look forward to a long-term relationship with them, both as an important

supplier and as a shareholder."

122.    Curd's statements were materially false and misleading for the same reasons set

forth in paragraph 120.

123.    On August 6, 2001, Defendants caused the Company to file with the SEC a

current report on Form 8-K, in which the August 2nd press release was attached.  In the Form 8-K,

the Company disclosed that Emcore had made a $5 million loan to the Company on August 2,

2001 in the form of a credit agreement.  The proceeds of the loan were to be used by Uniroyal for

(i) working capital purposes or (ii) capital expenditures.

124.    On August 15, 2001, the Company announced  its financial results for the fiscal

third quarter ended July 1, 2001.  Commenting on the quarterly results, Defendant Curd stated in

relevant part:

> We continue to focus the Company on our long-term strategy
> which is to become a leader in optoelectronics and silicon carbide
> applications.  We are pleased with the progress we are making in
> the quality of our technology products and with the pace of our
> redeployment efforts to position the Company for significant
> growth in the high technology markets we have chosen. [Emphasis
> added.]

125.    Curd's statements concerning the quality of the products produced by the

Optoelectronics segment were materially false and misleading.  As alleged above in paragraphs

34-49, 57-58 above, Curd knew or recklessly disregarded that the Optoelectronics segment

struggled with the quality of its technology throughout the Class Period.

126.    On October 2, 2001, the Company issued a press release announcing its highest sales month since its inception, which it attributed to an increase in demand for high brightness LED products.   The Company also extolled its product line: "Unique to the high brightness LED industry, Uniroyal Optoelectronics provides a full range of products including high brightness blue, green and red LEDs as well as ultra violet (UV) LEDs. UOE's September sales and its current backlog represent a mix of its product offerings."  Soran stated: "We have developed reliable LED products with exceptional brightness levels that allow UOE to participate in many of the high brightness LED markets. . . . The mix of product sales demonstrates the high quality of each of our product lines."

127.    The statements in the October 2nd press release concerning the Optoelectronic segment's product mix were materially false and misleading.  Defendants knew or recklessly disregarded that, as alleged above in paragraph 36, the segment had problems developing high brightness red LEDs.  The reactors used to manufacture the red LEDs never produced that color. In fact, the only colors those reactors could manufacture once operational were amber and yellow.  The statement concerning the production of reliable LED products was made without a reasonable basis.  Defendants knew or recklessly disregarded that the devices produced were not saleable because they did not meet customer specifications.  In fact, as alleged above in paragraph 40, the products Uniroyal sought to sell to GELcore were so unreliable that GELcore declined to purchase them.

128.    In an October 22, 2001 interview with The Wall Street Transcript, Defendant Soran touted Sterling's abilities, explaining that "Our plan for Sterling is to value-add by developing devices, but right now we're primarily qualifying and selling the wafers."  At the same time, Defendant Soran also praised the Optoelectronic Division's abilities, highlighting the

45

"world class facility" Uniroyal built in Tampa, Florida, its technology for manufacturing blue and green HB LEDs and their scientific team. Soran further told the market that even though the semiconductor industry was having a "pretty tough time," because people will continue to need lights, he was still confident in the LED business. In fact, although recognizing the changes in the marketplace since September 11, Soran reminded the market to "keep in mind the space we're competing in. People are going to need lighting, and, in fact, we need better light sources that use less electricity and energy. So we're in the right place."

129.    Soran also told the market that the forecasts were very promising:

> Of course we can't provide forward forecasting in dollars, but I
> will refer to the market forecast for LEDs which is projected to
> triple by 2003, and the forecast that we just discussed for the
> silicon carbide marketplace. And we have geared up to be a pretty
> significant player in both markets. We would expect to grow very
> dramatically. Of course right now it's off of a small base, but both
> markets are forecasted to be very big industries and there is room
> in them for very responsible suppliers. In fact, in the case of
> silicon carbide products, one of the things that was holding it back
> commercially, we believe, is the fact that there was really only one
> supplier in the marketplace, and a lot of companies aren't willing
> to put major requalification or engineering efforts behind
> something that is single-sourced. [Emphasis added.]

130.    The above statements regarding Sterling were materially false and misleading because Soran failed to disclose that Sterling had had no success in its attempts to develop devices. Accordingly, Uniroyal had no reasonable basis for claiming that it would be a "pretty significant player" in the silicon carbide marketplace.

131.    The statements regarding UOE were materially false and misleading because Soren failed to disclose all the manufacturing problems discussed at paragraphs 34–42, above.

132.    Moreover, Soren failed to disclose that following the dissolution of the joint venture with Emcore, UOE could not possibly continue to "grow very dramatically." By

46

Uniroyal's own admissions in its bankruptcy filings, UOE had lost the "primary provider of the

equipment and research and development expertise" and its marketing partner. Further, Uniroyal

was left without a partner to pursue the joint venture objectives and share its funding

requirements. Specifically, it failed to received $21 million in cash from Emcore, a funding

requirement that had already been incurred. Furthermore, additional amounts were fully

committed. These losses were among the reasons the Company listed for ultimately having to

file for bankruptcy. Accordingly, the Company had no reasonable basis for their statements

conditioning the market to believe that UOE would be a "pretty significant player" in the LED

market.

     133.    Soren's statements regarding business prospects for the LEDs post September 11

were similarly lacking a reasonable basis. As Defendant Curd later explained in an affidavit

submitted in the bankruptcy proceeding:

> The Debtor's light-emitting diode business . . . [is] indirectly
> consumer- driven and, therefore, vulnerable to the general post-
> September 11 economic downturn and corresponding decline in
> demand for consumer products. For example, the Debtor's light-
> emitting diode technology is used for, among other things, lighting
> in cell phones and pagers. Many of the cellular communications
> companies that comprise a significant customer base for this
> technology have experienced depressed economic conditions of
> their own during the post-September 11 era. As a result, most of
> these companies scaled back on their research and development
> budgets; thus, greatly lowering demand for the Debtor's products.
> [Emphasis added.]

     134.    On December 31, 2001 the Company filed its annual report on Form 10-K for the

fiscal year ended September 30, 2001 with the SEC (the "2001 Form 10-K"). This document,

signed by Defendants Zulanas and Curd, stated in pertinent part:

> The excess of the purchase price over the fair value of the net
> identifiable assets, totaling $28,415,000 was allocated to goodwill
> and is being amortized on a straight-line basis over 5 years. In the

fourth quarter of Fiscal 2001, the Company recorded a write-down of Sterling goodwill of approximately $9,816,000. The write-down was in accordance with SFAS No. 121. Goodwill was determined to be impaired after revised undiscounted future cash flows were determined to be less than the carrying amount of goodwill. The amount of the write-off was then calculated as the excess of goodwill over the fair value of Sterling. The estimated fair value of the Company was determined through discounted cash flow models. Factors in the fourth quarter that led to impairment include the buyout of Emcore's minority interest on August 2, 2001 (Note 8) and the re-evaluation of the Compound Semiconductor and Optoelectronics segment which included revised strategies and projections.

135.   In contrast to the values set forth in the Third Quarter 2000 Form 10-Q, the 2001

Form 10-K stated that the Sterling acquisition price was allocated as follows (in thousands):

| | |
|---|---:|
| Working capital (excluding cash) | $ (521) |
| Cash | 613 |
| Property, plant and equipment | 1,840 |
| Deferred tax asset | 2,656 |
| Intangible assets | 6,102 |
| Other assets | 81 |
| Goodwill | 28,415 |
| Notes payable | (1,051) |
| Other liabilities | (3,392) |
| Net value of purchased assets | 34,743 |
| Purchased in-process R&D | 6,590 |
| Value of common stock and employee stock options issued | (40,614) |
| Cash paid for fractional shares | (2) |
| Accrued acquisition costs | (717) |
| Cash due at closing | $ -0- |

136.   The market price of Uniroyal stock declined in response to this announcement by

almost 50 percent, or $1.51 per share, to $1.69 per share, on enormous trading volume of

2,587,900 shares — many times greater than Uniroyal's daily average trading volume of slightly

over 260,000 shares.

137. On January 3, 2002, UOE announce a purported breakthrough in its LED products with a large area blue chip. The press release, entitled "Uniroyal Technology Corporation Announces High Power, Large Area Blue Light Emitting Diode Product," stated that the new chip produced 60mW of power, which made it one of the brightest LED devices in the high brightness LED marketplace. The press release claimed that the product was "available immediately for sampling by customers." Soran stated, "The successful development of its high power, large area chip is another example of the rapid increases in product performance being achieved at UOE. At 60mW in power, this chip provides the lighting industry with tremendous opportunities for solid state lighting applications."

138. The press release noted that the Company was expanding its ultraviolet LED product line with the development of a UV large area chip using the same technology, and that the UV chip was currently undergoing rigorous testing processes and was expected to produce power levels equivalent to the blue chip.

139. Further touting this product, the Company claimed that additional increases in power were anticipated from the design, and that the Company had applied for patent protection for certain elements of the design.

140. These statements were all false and misleading because there was no such product developed at Uniroyal. According to Parades, no such product had ever been under development. During the time period the product touted above would have been under development, Parades who was responsible for creating the die cast for the machine that tested for brightness was never asked to create the die cast or test such a die. Accordingly, the press release claiming UOE had developed breakthrough technology was materially false.

49

141.   On the morning of April 18, 2002, the Company announced that it had reached an agreement to sell Sterling to Umicore USA Inc. ("Umicore").   The sale, contingent upon certain regulatory requirements, was expected to be completed in May 2002.  "Under terms of the agreement, the purchase price includes a cash payment of approximately $13.0 million, including the refinancing of existing debt."  The press release also disclosed that: "For the Fiscal year ended September 30, 2001, Sterling had sales of approximately $3.7 million and an operating loss of $7.0 million."

142.   Commenting on the proposed sale, Defendant Curd conceded that Sterling was a cash drain on the Company and that the Company did not have the financial wherewithal to fund Sterling's operations:

> There are only positives in this transaction. It puts Sterling in the ownership of a financially strong parent, which will maximize the long-term potential of the business while allowing Uniroyal to participate in its success. This agreement also enables UTC to improve liquidity while allowing us to focus on our Optoelectronics business and maximize its long term potential. [Emphasis added.]

143.   The news of a pending $13 million cash infusion sent the price of the Company's stock up from $0.55 per share on April 17, 2002, to a closing price of $0.70 per share on April 18, 2002, in unusually heavy trading.

144.   On May 13, 2002, the Company filed both a Form 8-K and Form S-3 with the SEC, both of which elaborated on the agreement to sell Sterling.  The Form 8-K was signed by Defendant Zulanas and the Form S-3 was signed by each of the Defendants.  Unlike the April 18, 2002 press release, which stated that "the purchase includes a cash payment of approximately $13.0 million," the Form S-3 stated that: "Under the terms of the agreement, the purchase price is $13.0 million, which will be reduced by the assumption by Umicore of certain liabilities and

50

indebtedness of Sterling that currently approximates $10.0 million, resulting in estimated cash proceeds of $3.0 million."

145.   The Form S-3 belatedly admitted: "We have not yet reached high volume commercial production levels." The Form S-3 also contained the following ominous warning: "We Are Experiencing a Liquidity Crisis."

146.   As a result of the disclosures, the price of the Company's stock dropped in recognition of the fact that less than two years after acquiring Sterling for stock with a purported value of $40.6 million, Uniroyal had agreed to sell it for approximately $3 million.

**The Truth Is Fully Disclosed**

147.   On May 15, 2002, Defendants caused the Company to file with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2002 (the "Second Quarter 2002 Form 10-Q"). In the Second Quarter 2002 Form 10-Q, the Company stated:

> On March 31, 2002, the Company recorded a $9,519,000 impairment loss related to goodwill at Sterling in connection with the proposed sale of Sterling (Note 7).
>
> On April 17, 2002, the Company entered into a stock purchase agreement with Umicore whereby the Company agreed to sell 100% of the outstanding stock of Sterling to Umicore. The purchase price is $13,000,000 and will be reduced by the assumption by Umicore of certain liabilities and indebtedness of Sterling that currently approximate $10,010,000, resulting in estimated cash proceeds of $2,990,000 . . . . The sale is expected to close in May 2002.
>
> In accordance with Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Live Assets and for Long-Lived Assets to be Disposed Of," the net assets of Sterling were determined to be impaired and a $16,000,000 loss on assets to be disposed of was recorded as of March 31, 2002. The impairment loss was measured as the amount by which the carrying amount of the net assets exceeded the fair value of the net assets. The estimate of fair value (less costs to sell) was based upon the expected future undiscounted cash flows

51

from the sale of Sterling but excludes the potential contingent consideration of up to $15,000,000. The amount of the impairment loss was allocated to eliminate the remaining goodwill at Sterling ($9,519,000), to eliminate the remaining intangible assets of Sterling ($3,864,000) and to reduce the value of the fixed assets at Sterling ($2,617,000).

148.   In addition, the 2002 Form 10-Q admitted that "[w]hen purchased, Sterling was primarily in its early stages of development and continues to be so today."

149.   On June 3, 2002, the Company issued a press release announcing that its agreement to sell Sterling to Umicore had been terminated, evidencing the fact that Sterling was not even worth $3 million. The next day, on June 4, 2002, Umicore announced that it was still looking for opportunities to develop its production of substrates, despite the collapse of its intended purchase of Sterling.

**False Financial Statements Caused By Accounting Violations**

**A. The Sterling Acquisition**

150.   On May 31, 2000, the Company announced that it had completed the Sterling acquisition "for approximately 1,533,000 shares of Uniroyal common stock." As later revealed by Defendants in the 2000 Form 10-K, the purchase price was allocated as follows (in thousands):

| | |
|---|---:|
| Working capital (excluding cash) | $  (521) |
| Cash | 613 |
| Property, plant and equipment | 1,840 |
| Deferred tax asset | 2,656 |
| Intangible assets | 6,102 |
| Other assets | 81 |
| Goodwill | 28,415 |
| Notes payable | (1,051) |
| Other liabilities | (3,392) |
| Value ascribed | 34,743 |
| Purchased in-process R&D | 6,590 |
| Value ascribed to common stock and employee stock options issued | (40,614) |

| | |
|---|---|
| Cash paid for fractional shares | (2) |
| Accrued acquisition costs | (717) |
| Cash due at closing | $ -0- |

151.   The value ascribed to the acquired intangible assets (categorized above as

"intangible assets" in the sum of $6,102,000, "goodwill" in the sum of $28,415,000, and

"purchased in-process R&D" in the sum of $6,590,000), which aggregated $41,107,000, was

grossly excessive given the fact that Sterling had experienced losses from operations from

inception, had negative working capital and an accumulated deficit, had no significant contracts

for the sale of its products, had a "limited product line of epitaxial thin film coatings," and was

doubtful to continue as a going concern.

152.   The valuation was based upon future revenue and earnings growth that was not

grounded in fact.  As set forth in the Company's 2000 Form 10-K:

> The identifiable intangible assets and IPR&D of Sterling were
> valued on the acquisition date using an income approach and, in
> the case of the trained workforce intangible asset, a cost to
> replicate approach. In the income approach, a cash flow was
> developed associated with the respective asset after charges for the
> use of existing assets (as applicable) and consideration of the
> economic life of the asset (reflected by the obsolescence factor).
> The income stream was discounted to its present value based upon
> the estimated discount rate. The discount rate was based upon our
> required rate of return, useful life of the technology and risks
> associated with the timely completion of the product lines. In the
> case of IPR&D, the "exclusionary rule" was applied by which the
> indicated value was multiplied by the estimate of the percentage of
> the total technology that was complete as of the valuation date.
> Percentage of completion was determined based upon the relative
> number of critical issues solved to the total number of critical
> issues identified. Significant appraisal assumptions include revenue
> projections, margins and expense levels and the risk adjusted
> discount rate applied to the project's expected cash flows.
> [Emphasis added.]

53

153.   To support the grossly inflated ascribed values, the Company imputed an exchange value based upon the inflated price of Uniroyal stock, which it used as currency for the transaction.

154.   The fair value of an asset is the amount at which that asset could be bought or sold in a current transaction between willing parties, that is, other than in a forced or liquidation sale. However, as noted in FASB Statement Of Financial Accounting Concepts No. 2 ("Qualitative Characteristics of Accounting Information"):

> The cost of acquiring assets is more often than not capable of being determined unambiguously, but that is by no means always the case. Thus, if a collection of assets is bought for a specified amount, the cost attributable to each individual item may be impossible to ascertain. The acquisition cost may also be difficult to determine if assets are acquired in exchange for assets other than cash, by issuing stock, or in transactions with related parties.

155.   By artificially inflating the price of the Company's stock, and by ascribing an approximate $41.1 million value to the acquired intangible assets, Defendants misled investors to believe that the value ascribed to Sterling was a true reflection of the fair value of the assets when they knew otherwise.

156.   The investing public did not know, however, that the acquired intangible assets, which purportedly had a fair value of $41,107,000, were worth only a nominal sum, as subsequently evidenced by the fact that Uniroyal could not sell Sterling at any price. Accordingly, these assets were overstated by no less than $40 million at the date of acquisition.

157.   To the extent that these assets were not written down to a nominal value through a charge to earnings during the Class Period, the financial statements that were disseminated to the investing public reflected grossly overstated assets, income, and net worth.  In this regard, the Company's financial statements were materially false and misleading as follows:

54

(a)     As of July 2, 2000, and for the three and nine months then-ended, the Company's financial statements presented intangibles assets (i.e., goodwill) in the amount of $38,387,000. This figure reflected an overstatement of assets, income, and net worth approximating the same amount.

(b)     As of October 1, 2000, and for the year then-ended, the Company's financial statements presented intangibles assets (i.e., goodwill in the sum of $27,772,000, and other intangible assets, including existing product line, core technology, and trained workforce in the sum of $6,102,000) aggregating $33,874,000. This figure reflected an overstatement of assets, income, and net worth approximating the same amount.

**B. Inventory**

158.    According to Hansen, virtually all of the Company's non-Emcore Optoelectronics inventory was worthless, "would not function," and was "totally unsalable." Defendants effectively confirmed Hansen's assessment in the Company's Second Quarter 2002 Form 10-Q, wherein the Company stated that it was taking steps to "upgrade the quality of the inventories."

159.    Accounting Research Bulletin No. 43, Chapter 4, Statement 3 provides that: "The primary basis of accounting for inventory is cost." Accounting Research Bulletin No. 43, Chapter 4, Statement 5 also provides that:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as the cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

19.     Starting no later than fiscal 2001, Defendants knew, but failed to disclose, that the proceeds, if any, from the disposal of Uniroyal's inventory in the ordinary course of business

55

would be less than cost due to its unsalability.  Further, defendants knew or recklessly

disregarded that such nondisclosure resulted in material misstatements of the Company's

financial position and results of operations.

160.   In Uniroyal's Class Period financial statements, Defendants failed to recognize the

worthlessness of the Company's Optoelectronics inventory and failed to make the write-down,

which was required to properly state such inventory at the lower of cost or market value in

compliance with GAAP.  By failing to write down the inventory to the lower of cost or market

value through a charge to earnings during the Class Period, Uniroyal's financial statements

reflected grossly overstated assets, income, and net worth.

### First Quarter 2000 Form 10-Q

161.   The financial statements that appeared in the First Quarter 2000 Form 10-Q

reported inventory and goodwill of $13,684,000 and $29,079,000, respectively.  The First

Quarter 2000 Form 10-Q also stated: "In the opinion of the Company, all adjustments necessary

for a fair presentation of such interim Condensed Consolidated Financial Statements have been

included."

162.   The reported inventory of $13,684,000 was materially false and misleading

because it was comprised largely of non-workable and malfunctioning products and products for

which there was no market.  As a result, this inventory was virtually worthless.  It was not

written down, through a charge to earnings, as required by GAAP (Chapters 3 and 4 of ARB 43).

Accordingly, the Company's reported results of operations for the fiscal quarter ended December

31, 2000 were materially overstated.

163.   The reported intangible asset (i.e., goodwill) of $29,079,000 was materially false

and misleading for the reasons set forth above.  This intangible asset was not written down,

56

through a charge to earnings, as required by GAAP (FASB Statement No. 121 and APB Opinion No. 17). Accordingly, the Company's reported results of operations for the fiscal quarter ended December 31, 2000 was overstated by approximately $38.4 million.

164.    As stated above, FASB Statement No. 5 requires that: "An estimated loss from a loss contingency . . . shall be accrued by a charge to income if . . . information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired . . . " and "the amount of the loss can be reasonably estimated." The applicability of this rule as it applies to the accounting for goodwill was reaffirmed with the issuance of Statement of Financial Accounting Standards No. 121.

165.    Statement of Financial Accounting Standards No. 121 ("accounting for the impairment of long-lived assets and for long-lived assets to be disposed of") "establishes accounting standards for the impairment of long-lived assets, certain identifiable intangibles, and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed of." This authoritative accounting literature "requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable." It further states that: "measurement of an impairment loss for long-lived assets and identifiable intangibles that an entity expects to hold and use should be based on the fair value of the asset." Additionally, it provides that an impairment loss is to be recognized as:

> the amount by which the carrying amount of the asset exceeds the fair value of the asset. The fair value of an asset is the amount at which the asset could be bought or sold in a current transaction between willing parties, that is, other than in a forced or liquidation sale . . . the estimate of fair value shall be based on the best information available in the circumstances.

166.    At all relevant times during the Class Period, Defendants were aware of the provisions of SFAS No. 121 as evidenced by the following, which appeared in the Company's 1999 Form 10-K, and as incorporated, by reference, into each of the Company's financial statements during Uniroyal's fiscal 2000 year:

> Statement of Financial Accounting Standards ("SFAS") No. 121, Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of, establishes accounting standards for the impairment of long-lived assets, certain identifiable intangibles and goodwill related to those assets to be held and used and for long-lived assets and certain identifiable intangibles to be disposed of. SFAS No. 121 requires that long-lived assets be renewed for impairment whenever events or changes in circumstances indicate that the book value of the asset may not be recoverable. The Company evaluates at each balance sheet date whether events and circumstances have occurred that indicate possible impairment. In accordance with SFAS No. 121, the Company uses an estimate of the future undiscounted net cash flows of the related assets over the remaining life in measuring whether the assets are recoverable.

167.    APB Opinion No. 17 ("Intangible Assets") states: "that the cost of each type of intangible asset should be amortized by systematic charges to income over the period estimated to be benefitted." In addition, it notes that:

> A company should evaluate the periods of amortization continually to determine whether later events and circumstances warrant revised estimates of useful lives...Estimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income (APB Opinion No. 9, paragraph 21) . . . .

168.    Even had the intangibles acquired from Sterling been worth the values ascribed upon acquisition, subsequent thereto, and as of the date of filing of the First Quarter 2000 Form 10-Q, the Company's intangible assets were not recoverable through future operations, due at least in part to the Uniroyal's inability to produce functional Optoelectronics devices as particularized above, and due to the fact that the intangible assets had a minimal sales value due

58

to the specialized nature of the operations and the limited number of potential acquirers that might be willing to pay a nominal sum for it. Accordingly, these assets were grossly impaired and the impairment was required to have been recognized in the Company's financial statements in compliance with GAAP (FASB Statement No. 121 and APB Opinion No. 17).

169.    Defendants knew of the foregoing and failed to cause the Company's financial statements as of December 31, 2000, and for the quarter then-ended to reflect the appropriate charges to earnings to recognize this impairment or recklessly failed to know of the impairment.

170.    The MD&A and the above specified representation were materially false and misleading because Defendants failed to disclose information regarding the inability of the Company to produce reliable and functional products, as well as the other facts as alleged above (see paragraphs 29-49). Additionally, the financial statements contained in the First Quarter 2000 Form 10-Q were materially false and misleading, at least in part, because they failed to comply with the GAAP (APB Opinion No. 28: "Interim Financial Reporting"), which states that management should provide commentary relating to the effects of significant events upon the interim financial results.

171.    The financial statements contained in the Second Quarter 2001 Form 10-Q presented inventory and goodwill of $13,116,000 and $27,592,000, respectively. These amounts were materially overstated for the same reasons that the inventory and goodwill, which were presented in the First Quarter 2000 Form 10-Q, were materially false and misleading. Additionally, the MD&A, which was contained therein, and the management representation regarding the "fair presentation" of the Company's financial statements were materially false and misleading for the reasons explained with respect to the First Quarter 2000 Form 10-Q.

172.    The financial statements contained in the Third Quarter 2001 Form 10-Q

presented inventory and goodwill of $12,157,000 and $22,258,000, respectively. These amounts

were materially overstated for the same reasons that the inventory and goodwill, which were

presented in the First Quarter 2000 Form 10-Q, were materially false and misleading.

Additionally, the MD&A, which was contained therein, and the management representation

regarding the "fair presentation" of the Company's financial statements were materially false and

misleading for the reasons explained with respect to the First Quarter 2000 Form 10-Q.

173.    The financial statements contained in the 2001 Form 10-K presented inventory

and goodwill of $13,110,000 and $23,430,000, respectively. These amounts were materially

overstated for the same reasons that the inventory and goodwill, which were presented in the

First Quarter 2000 Form 10-Q, were materially false and misleading. Additionally, the MD&A,

which was contained therein, and the management representation regarding the "fair

presentation" of the Company's financial statements were materially false and misleading for the

reasons explained with respect to the First Quarter 2000 Form 10-Q.

174.    Significantly, the September 30, 2001 Form 10-K stated that:

> the Company recorded a write-down of Sterling goodwill of
> approximately $9,816,000. The write-down was in accordance with
> SFAS No. 121. Goodwill was determined to be impaired after
> revised undiscounted future cash flows were determined to be less
> than the carrying amount of goodwill.

175.    The financial statements contained in the First Quarter 2001 Form 10-Q presented

inventory and goodwill of $6,626,000 and $22,743,000, respectively. These amounts were

materially overstated for the same reasons that the inventory and goodwill, which were presented

in the First Quarter 2000 Form 10-Q, were materially false and misleading. Additionally, the

MD&A, which was contained therein, and the management representation regarding the "fair

60

presentation" of the Company's financial statements were materially false and misleading for the reasons explained with respect to the First Quarter 2000 Form 10-Q.

*           *           *

176.    The market for Uniroyal's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Uniroyal securities traded at artificially inflated prices during the Class Period until the time that Uniroyal had engaged in the wrongful course of conduct described herein was finally communicated to, and understood by, the securities markets. Lead Plaintiffs and other members of the Class purchased or otherwise acquired Uniroyal securities relying upon the integrity of the market price of Uniroyal securities and market information relating to Uniroyal and have been damaged thereby.

177.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Uniroyal securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, finances and operations.

178.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Uniroyal's business, business practices and operations. These material misstatements and omissions had the effect of creating in the market an unrealistically

61

positive assessment of Uniroyal and its business, finances and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's common stock at an artificially inflated price, thus causing the damages complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

179.    At all relevant times, the market for Uniroyal common stock was an efficient market for the following reasons, among others:

(a)     Uniroyal common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient market;

(b)     As a regulated issuer, Uniroyal filed periodic public reports with the SEC and the NASD;

(c)     Uniroyal stock was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(d)     Uniroyal regularly issued press releases that were carried by national news wires. Each of these releases was publicly available and entered the public marketplace. As a result, the market for Uniroyal securities promptly digested current information with respect to Uniroyal from all publicly-available sources and reflected such information in Uniroyal's stock price. Under these circumstances, all purchasers of Uniroyal common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

62

## NO SAFE HARBOR

180.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Uniroyal who knew that those statements were false when made.

## ADDITIONAL SCIENTER ALLEGATIONS

181.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly participated in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Uniroyal and its business practices, their control over and/or receipt of Uniroyal's allegedly materially misleading misstatements and/or

their associations with the Company that made them privy to confidential propriety information

concerning Uniroyal were active and culpable participants in the fraudulent scheme alleged

herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the

information that they caused to be disseminated to the investing public.  The ongoing fraudulent

scheme described in this Complaint could not have been perpetrated over a substantial period of

time, as has occurred, without the knowledge and complicity of the personnel at the highest level

of the Company, including the Defendants.

## FIRST CLAIM

### For Violations Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

182.    Lead Plaintiffs repeat and reallege each and every allegation contained above.

183.    Each of the Defendants: (a) knew or recklessly disregarded material, adverse non-

public information about Uniroyal's financial results and then-existing business conditions,

which were not disclosed; and (b) participated in drafting, reviewing, and/or approving the

misleading statements, releases, reports and other public representations of and about Uniroyal.

184.    During the Class Period, Defendants, with knowledge of or reckless disregard for

the truth, disseminated or approved the false statements specified above, which were misleading

in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading.

185.    Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b)

made untrue statements of material facts or omitted to state material facts necessary in order to

make statements made, in light of the circumstances under which they were made, not

64

misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Uniroyal stock during the Class Period.

186.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Uniroyal securities.  Lead Plaintiffs and the Class would not have purchased Uniroyal securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

**SECOND CLAIM**

**Against Defendants**
**For Violation Of Section 20(a) Of The Exchange Act**

187.   Lead Plaintiffs repeat and reallege each and every allegation contained above.

188.   Defendants acted as controlling persons of Uniroyal within the meaning of Section 20(a) of the Exchange Act.  By reason of their senior executive and/or Board positions they had the power and authority to cause and did cause Uniroyal to engage in the wrongful conduct complained of herein.

189.   By reason of such wrongful conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with the purchases of Uniroyal securities during the Class Period.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

1.   Determining that this action is a proper class action and certifying Lead Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class

members against all Defendants for all damages sustained as a result of Defendants' wrongdoing,

in an amount to be proven at trial, including interest thereon;

3.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

4.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiffs hereby demands a trial by jury.

Dated: November 14, 2002

**BARKER, RODEMS & COOK, P.A.**

By: _Chris A Barker_
Chris A. Barker

300 West Platt Street, Suite 150
Tampa, Florida 33606
(813) 489-1001

**Liaison Counsel for Plaintiffs and the Class**

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

Jeffrey M. Haber
Felecia L. Stern
Mary U. Hoover
10 East 40th Street
New York, New York 10016
Tel: (212) 779-1414

**Lead Counsel for Plaintiffs and the Class**

66